**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Leonard BINGHAM (94–4330); Terrance B. Bagley (95–3006); Josephus M. Petaway (95–3171); Craig S. Houston (95–3173), Defendants–Appellants.**

Nos. 94–4330, 95–3006, 95–3171 and 95–3173.

United States Court of Appeals, Sixth Circuit.

Argued Feb. 5, 1996.

Decided April 9, 1996.

Rehearing and Suggestion for Rehearing En Banc Denied May 23, 1996.

618

Deborah K. Rump (argued and briefed), Office of U.S. Atty., Western Division, Toledo, OH, for U.S.

Spiros P. Cocoves (argued and briefed), Toledo, OH, for Leonard Bingham.

Carol L. Damrauer (argued and briefed), Toledo, OH, for Terrance B. Bagley.

Paul L. Geller (argued and briefed), Scalzo, Cherry, Geudtner & Geller, Toledo, OH, for Josephus M. Petaway.

Terry K. Sherman (argued and briefed), Columbus, OH, for Craig S. Houston.

Before MERRITT, Chief Judge, and CONTIE, and BOGGS, Circuit Judges.

CONTIE, Circuit Judge.

Defendants-appellants, Leonard Bingham, Josephus Petaway, Craig Houston, and Terrance Bagley, appeal their convictions and sentences for possession of cocaine and cocaine base with intent to distribute in violation of 21 U.S.C. § 841(a)(1); conspiracy to distribute cocaine in violation of 21 U.S.C. §§ 841(a)(1), 846; being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g); and carrying or using a firearm in relation to a drug trafficking offense in violation of 18 U.S.C. § 924(c). For the following reasons, we affirm in part and reverse in part.

I.

This case involves a drug operation in the housing project called "Lima Estates" in Lima, Ohio. A local task force began investigating drug trafficking in Lima in 1989. In September 1992, they were joined by federal A.T.F. agents. On June 16, 1993, a six-count indictment was returned by the federal grand jury in Toledo, charging eight defendants for various violations of narcotics and conspiracy laws. The charged defendants were Craig Houston, Josephus Petaway, Dan Lindsey, Shawn Bagley, Shawn Petaway, Jessie Petaway, Linda Petaway, and Leonard Bingham.

On July 14, 1993, a 16–count superseding indictment was returned, adding firearm violations. An additional defendant, Terrance Bagley, was charged with narcotics and firearm violations. Three defendants, Shawn, Jessie, and Linda Petaway, pled guilty and decided to testify on behalf of the United States.

By the end of June 1993, most of the defendants had been arrested, but Dan Lindsey remained a fugitive from justice. A bench trial began on June 3, 1994, and concluded on June 29, 1994. Dan Lindsey, who had been charged in the same indictment, was not tried with his codefendants. After Lindsey was arraigned on September 30, 1994, he pled guilty to the offenses charged and testified at the sentencing hearing of Josephus Petaway and Houston on January 30, 1995.

The facts which emerged at trial were as follows: a gang called "The East Side Posse" dominated the drug trade at the housing project, Lima Estates, in Lima, Ohio. Originally Terry Watkins was the head of the drug operation, but after he went to jail, Craig Houston and Josephus Petaway took over and assumed leadership roles. The East Side Posse gang conducted its operations from three primary locations in Lima— 356 Chester (the residence of Craig Houston and Linda Petaway), 901 West North (the residence of Dan Lindsey), and various apartments in the Lima Estates housing project. From these locations, the New York supplier was contacted, the powder cocaine was converted into crack cocaine, the crack cocaine was distributed, and the money was counted. The defendants sold crack cocaine or cocaine powder on the east side of Lima, Ohio from 1990 until their arrest in June, 1993. Defendants sold narcotics to cars which drove up to the project as well as to their regular clientele at the housing project.

Josephus Petaway and Craig Houston initially used sources in Detroit for their supply of cocaine. However, in late 1990, after Craig Houston met "Slick Rick" at a New Year's Eve party, their source of supply changed to New York. Defendants Josephus Petaway and Houston pooled their money with co-conspirator Dan Lindsey and used members of Josephus Petaway's family, juveniles, and others to transport cocaine from New York City to Lima, Ohio. The couriers included Shouri Cunningham, various members of the Petaway family, Mary Simpson, Dexter Turner, and Aaron Porter. Dwight Pirtle was a drug user and member of the gang, who became an informant. Mary Simpson, Shouri Cunningham, and Dexter Turner were not indicted and all agreed to become witnesses for the United States.

Craig Houston was primarily responsible for cooking the crack cocaine. Houston referred to himself as "the chemist," had a reputation for excelling in the "rocking" process, and was called in to assist other gang members when there were problems getting the cocaine to harden.

The testimony at trial of Dwight Pirtle, Dexter Turner, Jessie Petaway, Shawn Petaway, and Linda Petaway indicated that defendants Houston, Josephus Petaway, and Lindsey worked in combination and were confederates in frequent and repeated purchases of sizeable quantities of cocaine from New York City. Once the cocaine had been delivered to Lima, Ohio, defendant Houston would turn it into crack cocaine upon request of the various sellers. The evidence also indicated that the agreement between Josephus Petaway, Houston, and Lindsey was limited to the purchase of cocaine in New York and its delivery to Lima. Thereafter, according to the testimony of Dwight Pirtle, Nate Bundley, a government informant, and Jessie Petaway, defendants Houston and Josephus Petaway would deal on their own with the other alleged co-conspirators, who sold the drugs. The testimony regarding the sale of cocaine was "everybody had their own dope, everybody set their own prices, and everybody collected their own debts."

On April 7, 1992, the Ohio Highway Patrol made a traffic stop of a vehicle which included as passengers defendants Josephus Petaway, Houston, and Shawn Bagley. None of the occupants had any identification, nor did they have paperwork for the car, which had been rented by a third party from a car dealership in Lima. The officer searched the car and found a total of $28,427, which was seized. The testimony at trial indicated defendants were on a trip to purchase cocaine when they were stopped.

After the federal investigation into the East Side Posse gang began, there were nine controlled purchases of crack cocaine by government informants, most of which were recorded. On June 28 and July 1, 1993, search and arrest warrants were executed at various apartments used by the East Side Posse gang. The officers seized several firearms, including semi-automatic handguns, hundreds of rounds of ammunition, crack cocaine, a bullet-proof vest, drug paraphernalia, scales, and approximately $26,000.

Defendants waived their right to trial by jury and proceeded to trial before the bench. On July 18, 1994, the district court filed findings of fact and conclusions of law. All of the defendants had been charged in the conspiracy count, Count 1 of the indictment. The district court found that defendants Craig Houston, Josephus Petaway, and Shawn Bagley [1] were guilty beyond a reasonable doubt of participating in a conspiracy with Dan Lindsey to transport cocaine from New York City to Lima, Ohio. The district court found that the conspiracy between Houston, Josephus Petaway, and Lindsey was limited to the purchase of cocaine and its delivery to Lima, Ohio. Once the cocaine arrived in Lima, these three would deal separately with the other alleged co-conspirators. Therefore, in regard to the other defendants, the district court found that when they obtained drugs to sell from either Houston, Josephus Petaway or Lindsey, they were not participating in the conspiracy between those three to transport drugs to Lima, Ohio. The district court found that instead they were participating in a series of separate conspiracies with either Houston, Josephus Petaway

---

1. Shawn Bagley did not appeal his conviction.

or Lindsey, who at that point were operating on their own to sell their portion of the cocaine obtained from the shipments from New York.

Based on this reasoning, the district court found defendants Houston and Josephus Petaway guilty of conspiracy on Count 1, but acquitted defendants Terrance Bagley and Bingham on this count. He found each defendant guilty of using or carrying a gun in relation to a drug trafficking offense in violation of 18 U.S.C. § 924(c) based on specific weapons found in their residences during the execution of the search warrants and on testimony that they had been seen with weapons. In regard to the other counts of the indictment, the district court found defendants guilty as follows: defendant Houston, guilty of possession of ammunition as alleged in Count 7; defendant Josephus Petaway, guilty of possession with intent to distribute cocaine and cocaine base as alleged in Counts 4 and 5; defendant Bingham, guilty of possession with intent to distribute cocaine or cocaine base as alleged in Count 6, and being a former felon in possession of a firearm as alleged in Count 12; and defendant Terrance Bagley, guilty of possession with intent to distribute as alleged in Count 14.

The defendants timely filed an appeal.

## II.

We will first decide whether the district court erred in its convictions of Josephus Petaway, Craig Houston, Terrance Bagley, and Leonard Bingham for using or carrying a firearm in relation to a drug trafficking offense in violation of 18 U.S.C. § 924(c)(1).[2]

The district court convicted Josephus Petaway of violating 18 U.S.C. § 924(c) for possessing a Raven .25 caliber semi-automatic firearm, a Lucin .380 semi-automatic firearm, and a Richfield TU–90 semi-automatic firearm. The weapons were found in the apartment at 510 East North Street, which defendant Petaway shared with Keva Williams,

when a search warrant was executed there on June 28, 1993. There was no testimony that defendant Petaway was using these weapons when he was arrested, but several witnesses testified that they had seen defendant Petaway using firearms, although not the specific firearms charged in the indictment.

Defendant Houston was convicted under 18 U.S.C. § 924(c) for possessing a Ruger P89 9–mm. automatic firearm found at the residence at 356 Chester Place in a drawer in an upstairs master bedroom. The weapon was found during the execution of a search warrant at the apartment Houston shared with Linda Petaway. Defendant Bingham was convicted of violating 18 U.S.C. § 924(c) for possessing a Springfield Model 67H Savage Arms 12–gauge shotgun, which was found at his residence during the execution of the search warrant, and Terrance Bagley was convicted for possessing a Davis .380 caliber Model P–380 semi-automatic firearm seized from the master bedroom closet at his residence.

The district court found that defendants possessed the weapons found at their residences with the purpose of being "armed in furtherance of … drug related activities," Appendix, p. 84, and, therefore, they were guilty of violating 18 U.S.C. § 924(c). The district court's rationale was based on the "fortress theory" of use as set forth in *United States v. Henry*, 878 F.2d 937, 944 (6th Cir.1989). This theory supports a conviction for using or carrying a firearm in relation to a drug trafficking offense if "it reasonably appears that the firearms found on the premises controlled or owned by a defendant are in his actual or constructive possession, are to be used to protect the drugs, or otherwise facilitate a drug transaction." The district court in the present case reasoned that the guns found at the defendants' residences were part of their fortress arsenal to be used or carried in relation to drug trafficking.

---

**2.** 18 U.S.C. § 924(c)(1) states in relevant part:

Whoever, during and in relation to any crime of violence or drug trafficking crime (including a crime of violence or drug trafficking crime which provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device) for which he may be prosecuted in a court of the United States, uses or carries a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime, be sentenced to imprisonment for five years....

■ We find that defendants' convictions can no longer be sustained based on the rationale articulated by this court in *Henry*, because the Supreme Court has recently clarified the law concerning § 924(c)(1), rejecting the fortress theory of use. In *Bailey v. United States*, ——— U.S. ———, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995), the Supreme Court reversed two convictions under § 924(c)(1), holding that the evidence was insufficient to support either conviction under the "use" prong of the statute. *Id.* at ———, 116 S.Ct. at 509. The Court stated that "the language, context, and history of § 924(c)(1) indicate that the Government must show *active employment* of the firearm" to establish use within the meaning of the statute. *Id.* at ———, 116 S.Ct. at 506 (emphasis added). As applied to the two convictions in *Bailey*, the Court held that a firearm inside a bag in a locked car trunk and one locked in a footlocker in a bedroom closet did not constitute use of the firearm, *id.* at ———, 116 S.Ct. at 509, because "[s]ection 924(c)(1) requires evidence sufficient to show an active employment of the firearm by the defendant, a use that makes the firearm an operative factor in relation to the predicate offense." *Id.* at ———, 116 S.Ct. at 505. The Court explained that the situation "where an offender conceals a gun nearby to be at the ready for an imminent confrontation" does not constitute active employment. *Id.* at ———, 116 S.Ct. at 508. Rather, active employment connotes activities such as "brandishing, displaying, bartering, striking with, and most obviously, firing or attempting to fire, a firearm." *Id.*

■ In the present case, the district court did not determine whether the specific firearms with which defendants Petaway, Houston, Bingham, and Bagley were charged with possessing in the indictment (*See United States v. Leichtnam*, 948 F.2d 370 (7th Cir. 1991)) were carried or "actively employed" in relation to a drug trafficking crime as defined in *Bailey*. *United States v. Riascos–Suarez*, 73 F.3d 616 (6th Cir.1996). *See also*

*United States v. Hernandez*, 80 F.3d 1253 (9th Cir.1996); *United States v. Garcia*, 77 F.3d 274 (9th Cir.1996); *United States v. Jones*, 74 F.3d 275 (11th Cir.1996); *United States v. Abdul*, 75 F.3d 327 (7th Cir.1996); *United States v. Monroe*, 73 F.3d 129 (7th Cir.1995); *United States v. Valle*, 72 F.3d 210 (1st Cir.1995). Therefore, we must vacate the convictions of defendants Josephus Petaway, Craig Houston, Terrance Bagley, and Leonard Bingham under 18 U.S.C. § 924(c)(1) and remand to the district court for an analysis of the evidence pursuant to the Supreme Court's opinion in *Bailey v. United States*.

### III.

We will next determine whether the district court erred in the sentencing of Josephus Petaway.

Josephus Petaway was sentenced to life imprisonment on Count 1, the conspiracy count, for violating 21 U.S.C. §§ 841(a)(1), 846; 480 months each on Counts 4 and 5, the distribution counts, to be served concurrently; and 60 months on Count 9 for using or carrying a weapon in relation to a drug trafficking offense in violation of 18 U.S.C. § 924(c) to be served consecutively. Defendant Petaway appealed his conviction on Count 9, and the sentence imposed under Count 1, the conspiracy count.

### A. *Relevant Conduct and Quantity of Drugs Involved in the Conspiracy.*

■ Under United States Sentencing Guideline § 1B1.3(a)(1), a defendant convicted of conspiracy is responsible for the amount of drugs involved in transactions by others in the conspiracy if the court finds that the acts were in furtherance of the jointly undertaken criminal activity the defendant agreed to undertake and that the acts were reasonably foreseeable in connection with the criminal activity.[3] *United*

---

**3.** U.S.S.G. § 1B1.3(a)(1) states:
 *Relevant Conduct (Factors that Determine the Guideline Range)*
 (a) *Chapters Two (Offense Conduct) and Three (Adjustments).* Unless otherwise specified, (i)

the base offense level where the guideline specifies more than one base offense level, (ii) specific offense characteristics, and (iii) cross references in Chapter Two, and (iv) adjust-

*States v. Sims*, 975 F.2d 1225, 1244 (6th Cir.1992), *cert. denied*, 507 U.S. 932, 113 S.Ct. 1315, 122 L.Ed.2d 702 (1993); *United States v. Hodges*, 935 F.2d 766, 774 (6th Cir.), *cert. denied*, 502 U.S. 889, 112 S.Ct. 251, 116 L.Ed.2d 206 (1991).

■ We review the sentencing court's factual findings about the amount of narcotics for which a defendant is to be held accountable pursuant to U.S.S.G. § 1B1.3(a)(1) under a clearly erroneous standard. *United States v. Ferguson*, 23 F.3d 135, 141–42 (6th Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 259, 130 L.Ed.2d 179 (1994); *United States v. Wilson*, 954 F.2d 374, 376 (6th Cir.1992). The sentencing court's relevant conduct approximation must be based on reliable information and supported by a preponderance of the evidence. U.S.S.G. § 6A1.3(a); *United States v. Zimmer*, 14 F.3d 286, 290 (6th Cir.1994); *United States v. Walton*, 908 F.2d 1289, 1301 (6th Cir.), *cert. denied*, 498 U.S. 906, 111 S.Ct. 273, 112 L.Ed.2d 229 (1990). Where the amount of drugs involved is uncertain, the court is "urged to 'err on the side of caution' and only hold the defendant responsible for that quantity of drugs for which 'the defendant is more likely than not responsible.'" *United States v. Baro*, 15 F.3d 563, 568–69 (6th Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 285, 130 L.Ed.2d 201 (1994).

In the present case, the district court stated the following about the amount of cocaine for which defendants Petaway and Houston should be held accountable: [4]

Although no precise computation of the extent to which the powdered cocaine which was brought into Lima by the defendants was converted into crack cocaine was possible, nonetheless, I think the record fairly supports a finding that of the 25 kilograms that are that minimum that I think these defendants were responsible for during the period of the conspiracy,

minimum of ten kilograms of that was converted into crack cocaine even if a substantial portion of that which was ultimately allocated to Mr. Houston was sold by him as powder.

Nonetheless, ... in light of the overall evidence in the record, the record fairly supports by a preponderance of the evidence that both of these defendants [Craig Houston and Josephus Petaway] were aware that a substantial portion of the drugs would ultimately be converted into crack cocaine in all likelihood that the conversion was done by Mr. Houston regardless of whose cocaine it may have been, so that even if he directly sold less than ten kilograms, I think that the law permits attribution to him of amounts ultimately sold by other participants including Mr. Josephus Petaway. So that at minimum, each of these defendants was accountable for ten kilograms of crack cocaine during the period of the conspiracy.

The district court concluded that during the course of the conspiracy, which he limited in scope to the transportation of cocaine from New York City to Lima, Ohio, defendants Houston and Josephus Petaway were each responsible for the total amount of cocaine powder transported—25 kilograms. The district court believed that 25 kilograms was a conservative estimate, and from the 25 kilograms of powder cocaine, at least 10 kilograms was converted to crack cocaine, for which defendants Petaway and Houston were jointly responsible. The district court excluded from his calculation of drug quantity any amounts based on conduct outside the scope or the time frame of the conspiracy, which he determined lasted from Houston's release from prison at the end of June 1991 until the end of June 1993, when defendants were arrested, even though there was evi-

ments in Chapter Three, shall be determined on the basis of the following:

(1) (A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and

(B) in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or

not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity.

**4.** Defendants Josephus Petaway and Craig Houston make the same argument in their briefs in regard to this issue. Therefore, statements made will pertain to them jointly.

dence that the conspiracy had begun as early as 1989.

Defendants Petaway and Houston contend that the record is silent as to how the district court reached its calculation of 25 kilograms of powder cocaine and 10 kilograms of crack cocaine, and without any specific factual findings, the district court's calculations are at best speculative. Defendants rely on *United States v. Meacham,* 27 F.3d 214 (6th Cir. 1994). In *Meacham,* this court was disturbed by the speculative nature of the sentencing judge's quantity calculations and by the failure of the district court to make individualized findings about the scope of the conspiracy and the duration and nature of each *defendant's participation in the scheme. Id.* at 217.

Defendants' argument in the present case that the record is silent as to how the district court reached its drug quantity calculations has no merit. We find that contrary to defendants' contentions, the district court made an individualized inquiry into the government's evidence against each defendant and made specific findings about the scope of conduct for which each defendant would be held responsible. The district court made separate findings of fact about defendant Petaway's and defendant Houston's participation in the conspiracy and took into account the time each was incarcerated during the course of the conspiracy. The court also made specific findings about the scope of the conspiracy, stating:

> My perception was at the time I adjudicated culpability, that, as I have used the term earlier, these folks were joint venturers, they were essentially pooling their resources to procure the cocaine, convert it, cause it to be converted to crack, and then in turn would service their customers, many of whom are shared, but as I have indicated, I don't think that the fact that they even had some of the same customers at various times caused this to be a wider conspiracy than that which I determined to have existed.

In addition, the district court made specific factual findings about the amount of drugs involved. He explicitly stated that he would not consider as relevant conduct drug sales made by defendant Houston or defendant Petaway that occurred outside the time frame of the conspiracy. He also stated that the drugs involved in such sales would play no role in his drug quantity computations.

Contrary to defendants Petaway's and Houston's contention, there was testimony at the trial and at the sentencing hearing indicating when the trips to New York to transport cocaine occurred, who went on the trips, the amount of money invested, and the amount of cocaine brought back to Lima. The record also contains evidence about the amount of powder cocaine which was converted to crack cocaine before sale, and the district court made specific findings in this regard.

We believe the findings of the district court are supported by a preponderance of the evidence. *Zimmer,* 14 F.3d at 290. At trial, Linda Petaway testified that defendants Josephus Petaway and Houston started transporting cocaine from New York to Lima at about a kilo a month, which increased to three kilos a month during the time frame of the conspiracy. Linda Petaway, Mary Simpson, Dwight Pirtle, and Keva Williams testified about the trips to New York. Shawn Petaway testified that defendants Houston, Josephus Petaway, and Dan Lindsey controlled the drug trade in Lima and named the people assisting them, calling them "soldiers and sellers." His statement was corroborated by the testimony of Jessie Petaway, who stated, "Everybody that you thought would sell dope that was in the streets were the people that were supplied by Houston, Josephus Petaway and Dan Lindsey." Dwight Pirtle testified that during the spring and summer of 1992, he was selling about 1/4 kilogram of crack per week, which he obtained from either Houston, Lindsey or Josephus Petaway. Dexter Turner testified that by mid–1992, he was selling about twelve ounces of crack every week. Nate Bundley testified he was receiving one to two ounces of crack per week for at least six months during the course of the conspiracy. The district court found these witnesses to be credible.

At the sentencing hearing, Bruce Lindsey testified that in 1991, he received crack from

either defendant Houston or defendant Petaway twice a week, first in the amount of $500–$1,000 sacks of rocks (1 1/2 ounces of crack cocaine); in 1992, he stated that he got crack from them everyday and was selling one to two ounces on a daily basis; by 1993, he was selling "weight," 1/4 kilo, once a week. He testified that he made four or five trips to New York with either Tim Petaway or Shouri Cunningham between 1991 and 1993 and brought back about two to three kilos per trip. He testified that during the period from 1992–93, other couriers also made trips to New York approximately every two weeks and brought back two to three kilos of powder cocaine each time. His testimony was corroborated by the testimony at trial that defendants transported one to three kilograms of cocaine from New York every three or four weeks. As the district court pointed out, there was no evidence that defendant Petaway's or defendant Houston's source of supply for powder cocaine during this time period was other than New York City, and several witnesses, who sold crack cocaine for them, testified that their only source or main source of cocaine was defendant Houston or defendant Petaway.

There was additional evidence indicating the large scale of the operation of the conspiracy. On April 7, 1992, defendants Houston and Petaway were stopped by the Ohio Highway Patrol and $28,747 was seized from the car. Linda Petaway, Jessie Petaway, and others testified that defendants had been on their way to get a load of cocaine when they were stopped. There were three controlled purchases of crack cocaine by Nate Bundley from 901 West North during the investigation. Various officers testified at trial about surveillances at this location where they regularly observed defendants Houston and Josephus Petaway and their vehicles. Also during the trial, Jessie, Shawn and Linda Petaway, Dexter Turner, and others testified about their observations of large sums of cash, which they sometimes assisted defendants in counting. In addition, there was testimony about the large quantity of drugs observed. For example, Jessie Petaway testified that in April or May of 1993, he observed Houston and Josephus Petaway breaking down and weighing three kilos of cocaine. In addition to the trial testimony about trips to New York, Agent Bruce Marshall testified about telephone records, which established that a pager in New York was called 102 times from 356 Chester Place from February 1, 1993 to June 28, 1993. Finally, a drug tally sheet was seized on June 28, 1993, from a car parked in front of 356 Chester Place during the execution of a search warrant. The tally sheet indicated that there were outstanding drug debts totalling $18,000. Linda Petaway testified that the car was defendant Houston's vehicle and identified the sheet as a drug tally sheet written in defendant Petaway's handwriting. In regard to defendants' contention that the government's witnesses were inflating the amount of drugs that were transported and distributed, it should be noted that their statements corroborate each other. Moreover, in light of the amount of cash that was seized, the amounts about which they testified do not seem unreasonable.

■ Based on this evidence, we believe the record supports a finding that it was established by a preponderance of the evidence that defendants Houston and Petaway transported 25 kilograms of powder cocaine from New York City to Lima, Ohio. The evidence also establishes that it was reasonably foreseeable to defendants Houston and Petaway that a large proportion of the 25 kilograms of powder cocaine was being converted to crack cocaine before it was sold on the streets of Lima. Under this court's decision in *United States v. Jenkins*, 4 F.3d 1338 (6th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1547, 128 L.Ed.2d 197 (1994), one co-conspirator is responsible for the conduct of another co-conspirator if that conduct was reasonably foreseeable to him in furtherance of the execution of jointly undertaken criminal activity. As required by *Jenkins*, the district court in the present case determined the scope of criminal activity defendants Petaway and Houston agreed to jointly undertake. *Id.* at 1347. The court also set forth a factual basis for determining the individual conduct for which each defendant was responsible.

We affirm the district court's determination that defendants Petaway and Houston

were each responsible for the total amount of cocaine transported from New York to Lima, not just the amounts they took from the shipment and ultimately sold. Although they each had their own "soldiers" to sell their portion of the cocaine on the streets and worked independently in this regard, the money received from these independent operations was then pooled to pay for subsequent trips to New York to purchase more powder cocaine from a common source of supply. Therefore, their independent sales, including the sales of crack cocaine, were in furtherance of the jointly undertaken criminal activity to transport large quantities of powder cocaine from New York to Lima by pooling their money, using the same source of supply, the same couriers, the same protection, and the same method of transportation.

Although there was testimony to support defendant Houston's allegation that he sold mostly powder cocaine, there also was testimony that he was primarily responsible for cooking up the crack cocaine sold by the other defendants. Even if it is true, as alleged, that defendant Houston sold mostly powder cocaine, the evidence supports the district court's finding that he was primarily responsible for converting the powder cocaine to crack cocaine, which was eventually sold by either his "soldiers" or the "soldiers" of co-conspirators, Lindsey or Josephus Petaway. Therefore, the amounts of crack cocaine sold by defendants Josephus Petaway and Lindsey, which came from the shipments that they conspired with defendant Houston to transport from New York, were reasonably foreseeable to defendant Houston and were in furtherance of the conspiracy. Conversely, the amount of powder cocaine converted to crack by defendant Houston was reasonably foreseeable to defendant Petaway and in furtherance of the conspiracy. Therefore, defendants Houston's and Petaway's argument that they should each be held accountable only for the percentage of drugs each received from the New York shipments and for the percentage of crack cocaine each sold has no merit.

█ Example 8 of U.S.S.G. § 1B1.3 includes as relevant conduct ("the acts ...

aided or abetted" by a defendant in a jointly undertaken criminal activity) the following:

> Defendants T, U, V, and W are hired by a supplier to backpack a quantity of marihuana across the border from Mexico into the United States. Defendants T, U, V, and W receive their individual shipments from the supplier at the same time and coordinate their importation efforts by walking across the border together for mutual assistance and protection. Each defendant is accountable for the aggregate quantity of marihuana transported by the four defendants. The four defendants engaged in a jointly undertaken criminal activity, the object of which was the importation of the four backpacks containing marihuana (subsection (a)(1)(B)), and aided and abetted each other's actions (subsection (a)(1)(A)) in carrying out the jointly undertaken criminal activity.

U.S.S.G. § 1B1.3. Application Note 2(c)(8). In the present case, even though the district court found that the actual sales of cocaine to the ultimate buyer were more appropriately viewed as a number of separate criminal activities, this does not alter the fact that defendants Houston and Petaway were the local source of crack cocaine at Lima Estates, that they received their shipments of cocaine from a common New York source of supply at the same time, and that they coordinated their importation efforts by using the same couriers for mutual protection and assistance in transporting the money and drugs. Therefore, according to example 8, defendants Houston and Petaway are each accountable for the aggregate quantity of cocaine transported by them from New York to Lima, Ohio. *United States v. Critton*, 43 F.3d 1089, 1094 (6th Cir.), *cert. denied*, — U.S. ——, 115 S.Ct. 1987, 131 L.Ed.2d 873 (1995).

█ In addition, as several courts have stated, it is appropriate to convert powdered cocaine into cocaine base for sentencing purposes, if facts show that an object of the conspiracy was to convert powder to crack. *United States v. McMurray*, 34 F.3d 1405, 1414 (8th Cir.1994) (the court did not err in calculating the quantity of drugs as cocaine base rather than powder cocaine, because

"that was the form in which the cocaine was finally distributed to persons outside of the conspiracy"), *cert. denied,* —— U.S. ——, 115 S.Ct. 1164, 130 L.Ed.2d 1119 (1995); *United States v. Haynes,* 881 F.2d 586, 592 (8th Cir.1989) (converting amount of powder cocaine into crack for purposes of sentencing was proper, because evidence showed defendant was "in the business of selling crack cocaine and not powder cocaine"). In the present case, we find that the evidence supports the district court's finding that it was the intent of the conspiracy between Petaway, Houston, and Lindsey to convert a large proportion of the powder cocaine transported from New York into cocaine base or crack. The conspirators routinely had the powder cocaine converted to crack before selling it through their individual networks. They were responsible for weighing it, rocking it, and distributing it. Co-conspirator Houston, "the chemist," provided assistance and instruction to the other co-conspirators in converting the powder cocaine to crack before it was sold at Lima Estates.

 Based upon the consistent testimony at trial and at the sentencing hearing about the amount of cocaine transported from New York City, the specific testimony of a number of witnesses about what they observed and about the amount of crack they sold on behalf of either defendant Petaway or defendant Houston, and the cash seizures during the course of the investigation totaling over $50,000, we find the evidence adequately supports the district court's conclusion that defendants Josephus Petaway and Craig Houston should each be held accountable for 25 kilograms of powder cocaine, 10 kilograms of which was converted to crack cocaine. Under this court's decision in *Jenkins,* 4 F.3d at 1345–46, the district court must set forth the factual basis for determining the individual conduct each defendant in a conspiracy is responsible for and how much of the overall conspiracy was jointly undertaken and reasonably foreseeable to each defendant. In the present case, we believe the district court fulfilled its obligations under *Jenkins.* The district court is affirmed on this issue.

### B. *Enhancement for Role in the Offense.*

 Under U.S.S.G. § 3B1.1, the district court enhanced defendant Petaway's base offense level by four levels for his role in the conspiracy for being an organizer, leader, manager, or supervisor of five or more other participants. We review the district court's determination for clear error. *United States v. Williams,* 894 F.2d 208, 213 (6th Cir.1990).

 Defendant Petaway's argument that he had an equal role in the conspiracy with Lindsey and Houston, did not manage them, and had less than five subordinates has no merit. As this court stated in *United States v. Bashara,* 27 F.3d 1174, 1184 (6th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 909, 130 L.Ed.2d 791 (1995), it is not necessary for the district court to find that a defendant had five accomplices working for him in order to justify enhancing his sentence under this guideline, if "the defendant was a manager or supervisor ... and the criminal activity involved five or more participants." The text of the guideline and its commentary does not require that five of the activity's participants be subordinate to the defendant; it merely requires that the activity involve five or more participants. In the present case, there was sufficient evidence indicating that defendants Petaway and Houston were supervisors or leaders of a conspiracy involving at least five people. Six defendants pleaded or were found guilty of being part of the conspiracy. The testimony at trial indicated that defendants provided drugs to a number of dealers including Leonard Bingham, Terrance Bagley, Dexter Turner, Dwight Pirtle, and others. The testimony at trial also indicated that defendants Houston, Petaway, and Lindsey were the East Side Posse gang's source of supply for crack cocaine and that they determined when to order the cocaine, contacted the supplier in New York, negotiated the purchase price, and made arrangements for couriers to transport the cocaine from New York to Lima. Moreover, the testimony of codefendants indicated that defendants Petaway and Houston made important decisions which allowed the East Side Posse gang to control drug trafficking in East Lima and to use weapons or violence if necessary to protect

their territory. According to *Bashara*, decision making authority can be evidenced by playing a central role in coordinating the drug pool, collecting the buyers' funds, negotiating the purchase price with the supplier, and wiring payments. 27 F.3d at 1184. Therefore, in the present case, the district court was not clearly erroneous in determining that defendant Petaway's sentence should be enhanced for being a supervisor or organizer of the conspiracy pursuant to U.S.S.G. § 3B1.1.

### C. *Admission of the Testimony of Co-conspirator Daniel Lindsey.*

Co-conspirator Daniel Lindsey was a fugitive from justice when the defendants in the present case were tried. However, he was arrested and in custody at the time of defendants Houston's and Petaway's January 30, 1995, sentencing hearing. Lindsey decided to plead guilty and then testified on behalf of the United States at the sentencing hearing.

After arresting Lindsey, the United States gave him the opportunity to review the trial transcript of defendants' trial. Defendant Petaway contends that information was given to Lindsey by government agents to help him prepare his testimony for the sentencing hearing. Defendant Petaway argues that without access to the agents' interviews and assistance, it is impossible to determine whether Lindsey testified about what he was told, what he read, or what he vaguely recalled. Petaway also argues that the United States compounded the unconscionable witness preparation of Lindsey by assuring that no documentation of the process existed requiring disclosure under the Jencks Act. He contends the government avoided the Jencks Act by not writing down Lindsey's statements. Petaway argues that the conduct of the government in preparing Lindsey as a witness effectively precluded cross-examination and that his Sixth Amendment right to confront witnesses was violated.

■ Defendant Petaway did not raise the confrontation clause issue at the district court level and is, therefore, precluded from raising it on appeal. *United States v. Nagi*, 947 F.2d 211, 212–13 (6th Cir.1991), *cert. denied*, 504 U.S. 958, 112 S.Ct. 2309, 119 L.Ed.2d 230 (1992). Moreover, the confrontation clause does not apply in a sentencing hearing. *United States v. Silverman*, 976 F.2d 1502, 1510 (6th Cir.1992), *cert. denied*, 507 U.S. 990, 113 S.Ct. 1595, 123 L.Ed.2d 159 (1993).

■ We review the district court's admission of evidence at sentencing under an abuse of discretion standard. *United States v. Silverman*, 976 F.2d at 1508. The sentencing judge is given wide discretion in considering the evidence submitted at sentencing, because "most of the information now relied upon by judges to guide them in the intelligent imposition of sentences would be unavailable if information were restricted to that given in open court by witnesses subject to cross-examination." *Id.* In the present case, we agree with the United States that the real issue raised by defendant Petaway is the credibility of Dan Lindsey's testimony, which is an issue that belongs to the finder of fact. The circumstances which led to Lindsey's testimony pertain to the weight which should be given to this evidence, not its admissibility. Even if Lindsey's testimony at the sentencing hearing had not been credited by the district court, there was substantial other testimony to indicate the scope of the conspiracy and the amount of drugs transported. We do not believe that in such circumstances, it was an abuse of discretion to allow Lindsey's testimony. The district court is affirmed on this issue.[5]

### D. *Equal Protection Violation.*

■ Defendant Petaway argues that the penalty provisions of the Sentencing Guidelines which equate 100 grams of powder cocaine to one gram of crack cocaine violate his right to equal protection. This court has consistently rejected this argument as indicated in *United States v. Williams*, 962 F.2d 1218, 1227 (6th Cir.) *cert. denied*, 506 U.S. 892, 113 S.Ct. 264, 121 L.Ed.2d 194 (1992).

---

**5.** Defendant Houston's brief contained the same verbatim argument in regard to Lindsey. For the same reasons, the district court is affirmed.

As this court stated in *United States v. Pickett*, 941 F.2d 411, 418 (6th Cir.1991), given the problems caused by the special qualities of crack, it was not irrational for Congress to determine that "substantially greater penalties for the sale and distribution of crack were necessary." The district court is affirmed on this issue.[6]

### E. *Conclusion in Regard to Defendant Petaway.*

█ In regard to defendant Petaway, the district court is affirmed on all sentencing issues raised on appeal.[7] Defendant's conviction under 18 U.S.C. § 924(c) for using and carrying a firearm in relation to a drug trafficking offense is hereby vacated and remanded to the district court for a redetermination under the Supreme Court's recent opinion in *Bailey v. United States* for the reasons stated in section II.

### IV.

We must next decide whether the district court erred in the conviction and sentence of defendant Craig Houston.

The district court found defendant Houston guilty on Count 1 for conspiracy in violation of 21 U.S.C. §§ 841(a)(1), 846; on Count 7, for being a felon in possession of ammunition in violation of 18 U.S.C. § 922(g); and on Count 8, for using or carrying a firearm in connection with a drug trafficking offense in violation of 18 U.S.C. § 924(c). Defendant Houston was sentenced to life imprisonment on Count 1; 120 months' concurrent imprisonment on Count 7; and 60 months' consecutive imprisonment on Count 8. Defendant appealed his convictions under 18 U.S.C. §§ 922(g) and 924(c) and raised various sentencing issues.

### A. *Conviction for Violating § 922(g).*

Defendant Houston was charged on Count 7 of the indictment for the offense of being a felon in possession of ammunition in violation of 18 U.S.C. § 922(g). Specifically, it was alleged that on June 28, 1993, Mr. Houston, having been previously convicted of the offense of drug trafficking, knowingly possessed a magazine containing 9–mm. ammunition.

Houston was arrested on June 28, 1993, upon his arrival at 356 Chester Place while the police were searching the apartment. Agent Donald Bottles testified that the 9–mm. ammunition clip was in plain view on the front seat of the Honda Accord in the driveway. Agent Bottles had been called outside to search the Accord, which had not been there when he arrived to execute the search warrant. On his way out of the residence, he passed by defendant Houston, who had just been taken into custody by other police officers.

Initially, defendant Houston attempted to suppress the seizure of the ammunition, claiming that he had standing to challenge the search as the alleged owner of the vehicle. The evidence indicates that the car was owned by defendant Houston and had been a true gift transferred to him by Linda Petaway, his girlfriend. Moreover, the evidence indicates that he was observed operating the car at several locations, including Lima Estates.

█ Defendant Houston argues that the government failed to prove that he drove the car to the residence, that the ammunition clip was in plain view, or that he was aware that it was in the car. These arguments have no merit. Reasonable inferences can be made that defendant Houston drove the car to the apartment at 356 Chester Place, where he lived with Linda Petaway, because the car was not there when the police arrived and as soon as Agent Bottles went back outside, he saw that defendant Houston had been arrested next to the car. Moreover, the evidence indicates that the ammunition was removed from Houston's vehicle, he owned the gun it belonged to, and similar ammunition was re-

---

**6.** Defendant Leonard Bingham made a similar argument, which we also find has no merit.

**7.** Defendant Petaway did not offer into evidence the factors he wished the district court to consider for a downward departure. Moreover, an otherwise valid sentence is not appealable on the grounds that a defendant feels certain factors were not taken into account by the Guidelines. *United States v. Draper*, 888 F.2d 1100 (6th Cir. 1989).

moved from a gun in his residence. Therefore, we believe there was sufficient evidence to support defendant's conviction under 18 U.S.C. § 922(g). *United States v. Craven*, 478 F.2d 1329, 1333 (6th Cir.), *cert. denied*, 414 U.S. 866, 94 S.Ct. 54, 38 L.Ed.2d 85 (1973). The district court is affirmed on this issue.

### B. *Sentencing of Craig Houston.*

#### 1. *Relevant Conduct and Role in Offense.*

Defendant Houston raises the same arguments that defendant Petaway raised in regard to the amount of drugs attributed to him, pursuant to U.S.S.G. § 1B1.3(a)(1)—25 kilograms of powder cocaine, of which 10 kilograms was converted to crack cocaine. He also contests his four-level enhancement for a leadership role in the conspiracy. For the same reasons as stated under Issue IIIA and Issue IIIB in regard to defendant Petaway, the district court is affirmed on these issues in regard to defendant Houston.

#### 2. *Obstruction of Justice Enhancement.*

The district court enhanced the base offense level of defendant Houston by two levels for obstruction of justice as defined in U.S.S.G. § 3C1.1. The application note provides that this enhancement should be applied if the defendant has threatened, intimidated, or unlawfully influenced a codefendant. It also includes an enhancement for "committing, suborning, or attempting to suborn perjury." Prior to the start of trial and during trial, defendant Houston wrote several letters to his girlfriend, codefendant Linda Petaway, attempting to influence her decision to enter a guilty plea. The district court stated the following at the sentencing hearing:

> With regard to the issue of obstruction, I have examined the letters in detail, read all those letters, I think they do merit obstruction of justice. I think that he was undertaking, albeit, indirectly, and perhaps even somewhat ambiguously, to have Ms. Petaway have her testimony conform to his desires. I have given this a good deal of thought and that is the conclusion that I reach.

We review the district court's decision under a clearly erroneous standard. *United States v. Wilson*, 954 F.2d at 376. We find that the district court's decision that defendant Houston attempted to suborn perjury is not clearly erroneous, because excerpts from the letters include the following:

> I also have to tell you, Linda, taking the stand isn't easy at all. Everybody's family be staring down your throat and it's nerve racking. . . . You can say you seen me with the dope and money but you never seen me deal dope with anyone at trial. . . . Like I say, you can tell them I sold anyone dope, but don't say they work for me. You can say I sold dope, bought cars and jewelry, but don't say I ran with a gang. . . . I know you probably think I'm trying to use you but I got to tell you, you are the only way they can get to me. . . . Please tear all my letters up and get the information to me, its life or life in jail for me.
>
> You go all the way to trial, you won't get more than 10 years, and that is what my lawyer said, so you can believe me or some man you don't know about, like your lawyer.
>
> We have to stay pat, like in poker, they are bluffing their way to getting us to take a deal, but we have to call their bluff to come out of this. Well I just try to stay on top of things by talking to my lawyer and he told me point blank that if we all go to trial, the conspiracy will be dropped.
>
> The main thing is the gun and I already told you what to tell them.

At trial, Linda Petaway testified that Houston had told her that if she did not testify that a particular gun was hers, he would get into a lot of trouble and he did not want to go back to prison. Throughout his letters, Houston tells Linda Petaway to make certain that she not discuss how he fronted drugs, or that he worked with anyone, or that he had anyone working for him. It is clear that the issues about which he was instructing her to testify falsely were critical to a finding that he was involved in a conspiracy, which is the charge that resulted in his life imprisonment. For these reasons, the district court is affirmed on this issue.

C. *Conclusion in Regard to Craig Houston.*

In regard to defendant Houston, the district court is affirmed on all sentencing issues. Defendant Houston's conviction for being a felon in possession of ammunition in violation of 18 U.S.C. § 922(g) is affirmed. However, his conviction for using or carrying a firearm during and in relation to a drug trafficking offense in violation of 18 U.S.C. § 924(c) must be vacated and remanded to the district court for the reasons stated in section II.

## V.

We will next decide whether the district court erred in its conviction and sentence of Terrance Bagley.

Terrance Bagley was convicted on Count 14, for possession of crack cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1); on Count 15, for using or carrying a firearm in connection with drug trafficking in violation of 18 U.S.C. § 924(c); and on Count 16, for being a former felon in possession of a firearm in violation of 18 U.S.C. § 922(g). Defendant Bagley was sentenced to 151 months on Count 14, and 121 months on Count 16 to run concurrently. He was also sentenced to an additional consecutive 60–month sentence on Count 15. Defendant Bagley appeals his convictions on Counts 14, 15, and 16 and the sentence imposed on Count 14.

A. *Conviction for Violation of 18 U.S.C. § 841(a)(1).*

Count 14 charged defendant Bagley with knowingly and intentionally possessing with intent to distribute approximately 17 grams of a mixture or substance containing cocaine base or crack in violation of 21 U.S.C. § 841. The crack cocaine was found in a vase in Terrance Bagley's apartment along with his YMCA card when a search warrant was executed there on June 28, 1993. In addition, a bullet-proof vest, a pager, and a police scanner were also seized from the residence. A gram scale was found in the kitchen. The scale was the type commonly used by drug dealers. The government contends that the amount of crack cocaine found at the residence was consistent with sales rather than with personal use, because it was a 1/4 ounce rock with 25 smaller ones. Moreover, Dexter Turner testified that Terrance Bagley called him from jail and asked him to claim the dope. Furthermore, testimony by informant Pirtle indicated that defendant Bagley had sold drugs from his residence and was observed cutting up rocks of cocaine.

The district court found the following:

> In addition to the quantity of the contraband, which indicates that it was for sale, rather than for personal use, other items show that this defendant was a drug dealer. These include a firearm, bulletproof vest, a small scale, a police scanner and local pager. Possession of each of these items is consistent with involvement in drug trafficking and their discovery on the same premises as the crack establishes beyond any reasonable doubt that the contraband was intended for distribution.

Under a sufficiency of the evidence challenge, we must construe all the relevant evidence in favor of the government. *United States v. Morrow,* 977 F.2d 222, 230 (6th Cir.1992), *cert. denied,* 508 U.S. 975, 113 S.Ct. 2969, 125 L.Ed.2d 668 (1993). Under this standard, we believe there was sufficient evidence to convict defendant Bagley of possession with intent to distribute crack cocaine. The district court is affirmed on this issue.

B. *Conviction for Violation of 18 U.S.C. § 922(g).*

On June 28, 1993, a Davis .380–caliber Model P–380 semi-automatic firearm was seized from the master bedroom closet at Terrance Bagley's residence during the execution of a search warrant. We find there is sufficient evidence in regard to defendant Bagley's conviction under 18 U.S.C. § 922(g), which merely requires possession of a firearm by a former felon. Defendant Bagley does not contest that he is a convicted felon, but rather contends that he was not the owner of the gun. However, we believe that there was sufficient evidence that he possessed the handgun, because it was in the master bedroom closet of his residence.

Both actual and constructive possession satisfy the possession element for purposes of 18 U.S.C. § 922(g). *United States v. Craven*, 478 F.2d at 1333. Therefore, defendant Bagley's conviction for violating 18 U.S.C. § 922(g) is affirmed.

### C. Sentencing of Defendant Bagley.

Defendant Bagley argues that the district court erred in determining his base offense level based on 37.8 grams of crack cocaine.

Pursuant to U.S.S.G. § 1B1.3, the drug quantity attributed to defendant Bagley is to be determined on the basis of all acts committed by defendant in relation to his offense of conviction—possession of crack cocaine with intent to distribute. In calculating defendant Bagley's base offense level, the district court made specific findings and included the 9.7 grams of crack cocaine seized from Bagley's residence during the execution of the search warrant. The district court also included the amount of cocaine referred to in Government Exhibit 30, which was the drug tally sheet identified by Linda Petaway as written in the handwriting of Josephus Petaway. According to the tally sheet, Terrance Bagley owed Josephus Petaway a debt of $1,000. The district court relied on the testimony and evidence at trial that $1,000 would purchase approximately 28 grams of crack, and determined it was reasonable to infer that the amount indicated on the tally sheet was an amount that had been purchased by defendant Bagley from Josephus Petaway. The district court then determined Bagley's base offense level based on 37.8 grams of crack cocaine by adding 28 grams to the 9.7 gram amount of crack cocaine found at his residence. In making this determination, the district court did not rely on the count for which defendant Bagley was acquitted—the conspiracy count. He explicitly stated, "I don't think any of the drugs [which are] attributable to the conspiracy between Josephus Petaway and Craig Houston [are] properly attributable to this individual."

■ Defendant Bagley argues that the district court cannot use the amount from the tally sheet because Linda Petaway did not see Josephus Petaway writing on this alleged tally sheet nor did she have firsthand knowledge that Terrance Bagley owed Petaway $1,000 for drugs. This argument has no merit. We find the district court made a reasonable inference that based on the tally sheet, Terrance Bagley owed $1,000 to Josephus Petaway for 28 grams of crack cocaine. Therefore, the district court is affirmed on this issue based on the actual seizure of crack cocaine from defendant's apartment and the drug tally sheet.

### D. Conclusion in Regard to Defendant Bagley.

In regard to Terrance Bagley, his conviction and sentence for violation of 21 U.S.C. § 841(a)(1) is affirmed. His conviction for being a former felon in possession of a firearm in violation of 18 U.S.C. § 922(g) is affirmed. However, his conviction for using or carrying a firearm in relation to a drug trafficking offense in violation of 18 U.S.C. § 924 is vacated and remanded to the district court for the reasons set forth under section II.

### VI.

We must finally decide whether the district court erred in its conviction and sentence of Leonard Bingham.

Leonard Bingham was found guilty on Count 6, in violation of 21 U.S.C. § 841(a)(1) for possession with intent to distribute crack cocaine; on Count 12, for being a former felon in possession of a firearm in violation of 18 U.S.C. § 922(g); and on Count 13, for using or carrying a firearm in connection with drug trafficking in violation of 18 U.S.C. § 924(c). Bingham was sentenced to 262 months on Count 6 and 120 months on Count 12 to run concurrently. He was also sentenced to a consecutive 60–month sentence on Count 13. Defendant does not appeal his conviction on Count 6 or on Count 12. He appeals his conviction on Count 13 and raises various sentencing issues.

### A. Sentencing of Defendant Bingham.

Defendant Bingham argues that the district court erred in calculating his base offense level, which was based on the testimony of unreliable informants. This argument

has no merit as the district court set forth specific factual findings in determining that defendant Bingham was responsible for possession with intent to distribute 306.5 grams of crack cocaine, and 250 grams of cocaine powder. This determination was based on a "controlled buy" in which defendant Bagley sold 4.8 grams of crack cocaine, on 14.2 grams of crack cocaine seized from Bingham's residence on June 28, 1993, on the testimony of Dwight Pirtle (110.5 grams) and Keith Tobias (70 grams) regarding specific drug transactions involving defendant Bingham and themselves, and on the drug tally sheet which reflected an outstanding drug debt of $4,500 (126 grams). The district court did not include the 120 grams of crack cocaine found on Bingham's person when he was arrested.

Although defendant Bingham challenges the credibility of the testimony of Pirtle and Tobias, the issue of witness credibility is within the province of the finder of fact, which in the present case was the district court. Also, Bingham alleges that the district court relied on hearsay. To the contrary, the evidence indicates that the district court, in calculating the amounts attributable to defendant Bingham, referred to specific testimony involving first-hand-knowledge of drug transactions conducted by Bingham. Moreover, even if it were true that hearsay was admitted, it is properly considered at sentencing. *United States v. Silverman*, 976 F.2d at 1504. For these reasons, the district court is affirmed on this issue.

B. *Conclusion in Regard to Defendant Bingham.*

In regard to defendant Bingham, his sentence for his conviction for possession of cocaine in violation of 21 U.S.C. § 841(a)(1) is affirmed. However, his conviction for using or carrying a firearm in relation to drug trafficking in violation of 18 U.S.C. § 924(c) is vacated and remanded to the district court for the reasons stated in section II.

VII.

To conclude, the district court is **AFFIRMED** on all issues raised on appeal by all defendants except for their convictions under 18 U.S.C. § 924(c), which must be **VACATED** and **REMANDED** to the district court in light of the Supreme Court's opinion in *Bailey v. United States.*