**UNITED STATES of America, Plaintiff,**

v.

**James L. PARKER and Lyle D. Perry, Defendants.**

**No. 00–00160–01, 02–CR–W–HFS.**

United States District Court, W.D. Missouri, Western Division.

Dec. 30, 2002.

---

Christopher C Harlan, Collins Fairfield Fowler Harlan & Breen, James Robert Wyrsch, Wyrsch, Hobbs & Mirakian, P.C, John Justin Johnston, Wyrsch Hobbs & Mirakian PC, Kansas City, John Osgood, Lee's Summit, for James L Parker (1), Lyle D Perry (2), aka L.D. Perry, aka (2), Defendants.

James C. Bohling, Office of the United States Attorney, Marietta Parker, United States Attorney's Office, Kansas City, for USA, Plaintiff.

**SENTENCING RULING**

SACHS, District Judge.

Defendants Parker and Perry have been convicted of mail fraud, based on fraudulent inducement of investors during 1993–7 to become auto parts distributors affiliated with Parker's company ("FCI"). Defendant Parker, the leader in the activity, has also been convicted of money laundering by reason of using proceeds of his misconduct in paying business creditors and thus promoting further ·fraudulent solicitation.

The Government submitted to the jury nine factual theories of fraud. Neither party suggested, and the court did not use, interrogatories to determine how the jury may have viewed each of the various claims. A limiting instruction of the court (J) did advise the jury that crimes were committed only if there was intent to deceive (a distinction between negligent and fraudulent misrepresentation) and that it could not treat a breach of promise as fraudulent unless the promisor did not intend to perform when the promise was made.[1]

Guilty verdicts were rendered after a month-long trial in September of last year. Over a dozen investors testified. Out of some 70 distributorships set up by FCI about one-third of the investors registered complaints of fraud, as reported to the FBI when it surveyed the distributorships.

A presentence report was submitted in March, identifying some 23 distributor "victims". It was assumed in the report that all nine theories of misconduct were adopted by the jury and that all nine qualified as fraud. I cautioned the prosecution that the reliance of purchasers on instances of fraud should be shown at sentencing in order to create a firm basis for sentencing. After some urging by the court, the Government retained an economic expert, who submitted a report in September. At a sentencing hearing conducted on December 19 and 20, the economist's report was discarded and there was no attempt by the prosecution to supplement the presentence report. Apparently it was not deemed feasible to supply and classify additional information—or the court's requests were considered legally excessive. This poses serious questions as to the feasibility of fairly estimating loss and restitution.

After further study and deliberation I conclude that the Probation Office loss calculation, although conscientiously made by a competent layman with some "street smarts" about economic issues, is not usable for sentencing purposes in this complex case. This is partly because the information available to the officer was insufficient (a contention asserted on some significant subjects by the Government's retained economist[2]) and partly because using the Probation Officer as its main witness forced him to rely on double hearsay (FBI versions of interviews) which in this case probably cannot be characterized as "reliable hearsay," at least on the matters used to calculate loss.

The Probation Office calculation of loss started with the $5,000 which can be understood as a franchise fee. Out of about $105,000 typically charged for the original package of auto parts obtained from FCI by a new distributor, some 20% was treated as a loss, due to poor quality or obsolete condition. Out of some $35,000 paid as a "setup" charge, 50% was discounted because of weakness in the sales force supplied and selection of undesirable or insufficient auto repair shops and service stations in the assigned territory.

I consider the percentages suspect for several reasons. The claimants had an incentive to exaggerate problems and apparently were simply asked for general impressions without documentation. The FBI interviewers were probably biased by sympathy for what they were hearing from dissatisfied claimants.[3] They were likely

---

1. The famous example of this principle locally was in the Christine Craft television personality case. *Craft v. Metromedia, Inc.*, 766 F.2d 1205 (8th Cir.1985).

2. For example, he was unable to make a determination of loss from the proof of defi-

ciencies in setting up the distributorships or in supplying some unsuitable parts.

3. Some of the claimants were in dire straits, having incurred heavy debts, lost their sav-

advocates for the victims in some respects, not sternly impartial investigators. Apparently the FBI was not instructed to look for fraud as such but was approaching the issue more as in a civil case, where claims about broken promises and mismanagement may have equal status with fraud as the subjects of complaint.

The setting was rife for creation of a scenario unfairly skewed against FCI and defendant Parker, in the absence of confrontation and opportunity to cross-examine.

I conclude that the 50% loss on setup costs seems a loose and speculative figure, somewhat inconsistent with the fact that two-thirds of the distributors were either satisfied customers or had minor problems not worth pursuing.

I also am unable to work with the Probation Office estimate of an average 20% loss on products in the first package. It was represented to be a typical claim of loss identified in interview notes (302s) but the 302s were not submitted to me and there was no listing and tabulation of claims by named victims. Instead, the number seems to have been inferred from an "eyeball" scanning of the 302s of the victim class. A basic problem, at the risk of repetition, is that I am unpersuaded that there was a preponderance of evidence at trial or in the unseen 302s that would support a conclusion that the parts problem was essentially more than one of mismanagement and perhaps broken promises rather than fraudulent statements at the beginning of the relationship that induced the signing of contracts and triggered whatever losses occurred.[4] Reliance on one of the shakiest of the fraud claims for the critical calculation of loss

seems unwise, if another methodology is available.

In my judgment, which I am forced to exercise in the absence of information from the jury, the parts problem and the setup problem were at best borderline issues for the prosecution—unless the jury disregarded the instructions and found defendant Parker guilty on those claims simply because there was dramatic testimony about aggravations that arose during the consummation of some of the relationships, both in setting up accounts and in quality complaints about products, most notably brake pads.

To the extent there was over-claiming by defendant about parts quality and the placement plan, I remember few if any of the victim distributors testifying about their specific reliance on that sort of typical sales language in deciding to buy their distributorship. The failure to present evidence of reliance at trial is understandable in that it is not the essence of a criminal fraud claim. It is, however, necessary proof of loss used in sentencing and for restitution.

Being quite uncomfortable with the showing of loss contained in the Presentence Report I turn to another source of information or guidance to establish a sentencing range.

There are two ways to move. Either I can try to identify Parker's gain from his misconduct (leaving aside Perry for the present) or I can conclude that the dollar amount of loss cannot be fairly estimated and thus I am compelled to use a no-loss figure, probably with an upward departure because I agree with the prosecution that there was surely significant loss from the aspects of fraud that I believe were clearly

---

ings and left other employment to become distributors.

4. A practice of intentionally supplying bad parts makes no sense when, as here, defendant planned to continue in business.

established as such. At least five of the nine claims of fraud were, in my judgment, established by a preponderance of the evidence or much more.[5] If some of the foregoing might suggest I minimize defendant Parker's culpability, the impression is unwarranted. Identification of at least five fraudulent aspects of the solicitation of new distributorships shows a remarkable pattern of misconduct likely to cause financial ruin for dozens of investors. Mr. Parker has been shown to be a dangerous person in his business dealings with strangers. He might well be called a financial predator.

What did he and FCI gain from the fraudulent solicitations? The $5,000 franchise fee is a place to start. But I doubt there is an adequate record of gain with respect to startup costs, in that I don't have the slightest notion of how much the startup expense consumed the price paid.[6] As to the product package, markup is clearly the way a wholesaler or retailer obtains anticipated gain. There is good reason to estimate a 24% markup in this case, as advocated in the Third Addendum to the presentence report. In the analysis made by a banking official (S–10), apparently based on information supplied by defendant Parker and his accountant in attached documents, there are several references to a markup in the range of 24%, and what appears to be a Government figure of a comparable amount (28.7%) as the average for this particular industry.

Having disregarded probable but incalculable gain from the setup charge, I believe it would be conservative to use a 24% markup as the gain received from product sales to the distributors.

Defendant's counsel has not conceded that the 24% markup would be sound, but has not vigorously resisted the figure. He does decry the calculation because it is not a "net gain" figure, as he believes is required. It *is* net in the sense that it is not gross income from the sale of parts. It is, of course, not derived from a meticulous accounting of FCI's expenses (including for example the $500 paid to defendant Perry when he was responsible for the sale). The law is not well settled on the issue presented, but I believe my calculation is adequate. Several cases appear to have used such an approach.[7] Although the Sentencing Commission amended the Guidelines to delete an earlier authorization for use of "gross gain" and changed that to simple "gain" it did not specify a requirement that the sentencing court make a calculation of "net gain" in its most refined sense. See USSG § 2B1.1, Application Note 2(B)—Guidelines Manual for 2002, the most favorable to defendants, as will be seen. I conclude that a practical approach is what is required, and that use of markup is eminently practical for sentencing purposes. I also note that, whatever overhead allocations might be advocated by an auditor, it is the markup that

5. Claims 1, 2, 3, 4 and 9 submitted in instruction G seemed well established as fraudulent representations likely to induce reliance, and were uncomplicated by issues of negligence and optimistic promises. Claim 2, asserting one hundred percent success enjoyed by distributors, and Claim 3, implicitly concealing business bankruptcy, were, in my recollection, flagrantly misleading.

6. Arguably the defendant should have the burden of proving such costs but as a practical matter it is obvious that the effort involved

substantial costs and it would seem arbitrary to assume that there was a percentage of profit made from the charge in question.

7. *United States v. Brawner*, 173 F.3d 966 (6th Cir.1999) (deduction of cost of goods from gross gain in fraud case is appropriate); *United States v. Lima*, 1994 WL 2546 (9th Cir. 1994) (unpublished—Part IV b). Compare, *United States v. Badaracco*, 954 F.2d 928 (3rd Cir.1992) ("tangled inquiry" into details of net gain undesirable)

brings gain in the exact amount of the markup and thus produces the money that ultimately pays the bills.

I am therefore in partial agreement with the Third Addendum supplied by the Probation Office under date of December 18, previously distributed to counsel. I disagree, however, that gain from fraud should be applied as a punitive calculation against the whole body of distributors. Instead, as a surrogate for loss it seems it should be applied to the victim class.

The Presentence Report lists the persons deemed to be victims of the fraud. Defendant does not offer reasons to challenge the entire list, but at the sentencing hearing did question six of the 23 names in the Presentence Report. I agree with the Probation Office that Todd Reese is properly included, because Jim Parker participated in the solicitation and FCI ultimately got the funds as repayment on an Ethan Parker loan. Others on the victim list are challenged because there were subsequent buy-back arrangements. While a buy-back may limit restitution it would not, in my judgment, preclude treating the distributor as one of the original victims, with gain to defendant Parker in the standard amount. Subsequent favorable and unfavorable developments have not been taken into account in the approach deemed appropriate. Damage and gain are established at the time of the sale.

The calculation of gain from markup on the original package for 23 victims, plus $5,000 for the franchise fee yields $704,720, for defendant Parker. The Offense Level is 24, which is a total of the Base Offense Level of 6 for the violation under § 2B1.1, with a 14 point increase for the amount of loss calculated from the FCI gain, a 2 point increase for more than 10 victims, and a 2 point increase for leader-

ship role under § 3B1.1(c). The laundered funds calculation also yields an Offense Level of 24. This is a total of the Base Offense Level of 8 under § 2S1.1, added to 12 for the quantity of laundered funds, 2 for the statutory offense under 18 U.S.C. § 1956, and a 2 point increase for leadership role.[8]

Thus defendant Parker is subject to a sentencing range of 51–63 months, with a fine range of $10,000 to $5,500,000.

Turning to defendant Perry, I conclude that his criminal culpability rests on two issues. As he testified, he questioned defendant Parker about the representation that distributors using FCI had enjoyed 100% success. Even after Parker responded unsatisfactorily, and knowing the claim was misleading, Perry continued to participate in sales activities. Secondly, there was a limited period in 1995–6 when he participated in solicitations using the 1994 survey and the 10 percent per year increase in gross sales even after obtaining the partial but unfavorable result from the 1995 survey of distributors at the seminar in Orlando, Florida. This was the Government's ninth claim of fraud, submitted in instruction number G.

Damage from using the 100% success rate even after Perry had questioned it cannot be estimated. Based on the calendar, defendant Perry could only have gained $500 on the sales to victims Mark, Gann, Pozzo and Hicks under the ninth claim of fraud for a total of $2,000 and even this sum may not be fully supported by the evidence.

I therefore calculate the Offense Level as 6, without an increase for monetary loss exceeding $5,000. It does seem likely to me, however, that Perry was involved in

**8.** The request for a departure downward is rejected because of the wording of the instruction used by the jury. It is in any event immaterial (except as to three months) because the Guideline range would then be driven by the mail fraud conviction.

the victimization of more than 10 persons, which results in a 2 point increase, for a total Offense Level of 8. His guideline punishment range is thus 0–6 months. He is in Zone A, subject to favorable sentencing treatment. The fine range is $500–$75,000.[9]

In reaching the conclusions stated I recognize that both sides will have substantial grounds for appealing the sentences. For the benefit of the appellate court, I advise that, if reversed on the Parker sentence, I would, unless otherwise directed, conclude that loss or gain cannot be fairly estimated on the present record either for restitution or punishment[10], and would sentence from the bottom of the Offense Level, but would favorably consider a request for a substantial upward departure. Also, I would continue to use the current money-laundering calculation, as mandated by the Sentencing Commission.

Sentencing will now proceed based on the foregoing guideline determinations.

---

9. The parties will note that I do not find a preponderance of evidence supporting the Government's contention that defendant Perry engaged in criminal conduct in participating in the earlier surveys and their analysis and reporting. As demonstrated by the film, the 1993 survey may have been inadequately conducted, but not in a manner intended to deceive. I do not totally reject the notion that Parker may have recognized that the favorable results were likely exaggerated, or that a 10% growth rate would be unrealistic, but I believe it improbable, before the 1995 survey, that such views should be attributed to Perry.

"Dissatisfied with how James Parker ran FCI," Perry quit in May 1996. Presentence Report, ¶ 87. Moreover the information was directed toward prospective entrepreneurs, who were hardly more likely to believe that an annual increase in business by 10% was guaranteed or was more than an optimistic hypothesis. I wonder how many lawyers may open a new law office without hoping for such a growth rate from the initial base of clients.

