**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Steven D. BRAWNER, Defendant–Appellant.**

No. 96–2298.

United States Court of Appeals, Sixth Circuit.

Argued June 12, 1998.

Decided April 2, 1999.

---

Scott E. Pederson (argued and briefed), Grand Rapids, Michigan, for Defendant–Appellant.

Janice Kittel Mann, Asst. U.S. Atty., Timothy P. VerHey (argued and briefed), Office of the U.S. Attorney, Grand Rapids, Michigan, for Plaintiff–Appellee.

Before: DAVID A. NELSON and RYAN, Circuit Judges; ROSEN, District Judge.*

RYAN, Circuit Judge.

The defendant, Steven D. Brawner, appeals his conviction and sentence for conspiracy to commit mail fraud and wire fraud and for the substantive offenses of money laundering and wire fraud. Brawner contends that the district court abused its discretion by permitting the testimony of an expert on the practices of fraudulent telemarketing operations. In addition, Brawner challenges his sentence, claiming error in the district court's determination of the amount of loss attributed to him as relevant conduct and the applicability of the vulnerable-victim enhancement. We will affirm.

## I.

Brawner was indicted and convicted on the charges laid in Counts 1, 2, 3, 5, and 14 of a 14–count indictment stemming from his ownership and operation of two telemarketing businesses. Count 1 charged Brawner with conspiring with four codefendants to commit mail and wire fraud in violation of 18 U.S.C. § 371. Count 2 charged him with money laundering in violation of 18 U.S.C. § 1956, and Counts 3, 5, and 14 charged wire fraud in violation of 18 U.S.C. § 1343. Brawner was sentenced to 57 months' imprisonment. Brawner owned and operated two separate telemarketing operations. The first, National Marketing, operated out of California from 1989 through May 1993. The second, International Concepts, operated out of Grand Rapids, Michigan, from June 1993 through September 1993. Count 1 alleged that the activities of both operations were part of the charged conspiracy.

FBI Agent Stuart Roberts was listed in the government's pretrial disclosure as an expert on the subject of fraudulent tele-

marketing operations. Two of Brawner's codefendants filed a motion *in limine* to exclude Roberts's testimony on the grounds that he was not an expert, that expert testimony was not necessary for the jury to understand the issues in the case, and that the prejudice that would result from such testimony would outweigh its probative value. Brawner joined in this motion at trial. The court denied the motion, reasoning that expert testimony on sophisticated telemarketing schemes and practices would assist the trier of fact.

Before addressing the challenge to Roberts's expertise, we summarize his testimony describing the defendant's alleged *modus operandi.*

The foundation for Roberts's testimony included his statements that he had garnered extensive expertise on the subject during his nine years with the federal telemarketing fraud task force, and that he had testified as a telemarketing expert in three prior criminal trials. Roberts then detailed the methodology typically followed by fraudulent telemarketers. He explained that "leads" are purchased and that these leads often identify individuals who have entered a contest by filling out a personal data card or perhaps by remitting a small qualifying fee. The data cards generally contain the entrant's name, address, phone number, and age. Roberts testified that elderly persons constitute the main group targeted by fraudulent telemarketing organizations because the elderly, for several reasons, are susceptible to telemarketing fraud. These people are thought to be predisposed to sending money in the hope of striking it big; therefore, they are good prospects for fraudulent telemarketers. Roberts testified that documentary evidence indicated that International Concepts had purchased leads from a "leads broker" and that each lead contained the respondent's age.

* The Honorable Gerald E. Rosen, United States District Judge for the Eastern District of Michigan, sitting by designation.

Roberts also examined telemarketing "scripts" seized from Brawner's International Concepts operation. Roberts testified that the scripts were consistent with a "one-in-five" sales pitch commonly used by fraudulent telemarketers. In a one-in-five scheme, the telemarketer tells the prospect that he has been chosen for one of five "valuable" prizes; however, the prospect is first pressured into buying a promotional product at an inflated price. He is then told that the "small amount of money" he is required to send in will pale in comparison to the value of the prize he will win. In reality, however, the promotional product and the prize actually awarded—typically a relatively cheap "gimmie gift"—are worth, at most, about 30% of the remitted payment.

Roberts also identified a tape-recorded conversation seized from International Concepts as a "verification call" typically used by fraudulent telemarketers in order to verify that the prospect has succumbed to an earlier one-in-five pitch. During such calls—which, unlike the sales pitch, are recorded—the telemarketer induces the victim to say that he agreed to send money in order to purchase the product, rather than to qualify for the prize. Thus, the verification call serves as a disclaimer.

Roberts testified that Brawner's business operations were consistent with those generally followed by fraudulent telemarketing organizations. The government then called 14 witnesses, each of whom claimed to be a victim of the scheme. All of the witnesses testified, in general, that they were never told that the award they would receive would be worth less than the money solicited from them. Four of these witnesses testified that they did receive the agreed upon merchandise and a prize. Chad Duvall, a former employee of Brawner's National Marketing operation, testified that he was paid to mislead customers into believing they would receive a valuable reward, and that he never told them that they would actually lose money on the transaction. Duvall stated that he pre-ferred calling persons over 60 years of age because they were more likely to participate in the promotion. He testified that he and Brawner "reloaded" customers, which means they would make follow-up calls to victims who participated in an earlier one-in-five promotion in an attempt to sell them on a new one-in-five promotion, typically one requiring a larger remittance. The government also introduced a tape "verifying" a sale to an 80–year–old woman. The tape revealed that the woman sent in her entire month's income only because the salesman had assured her she had won a large cash award.. This same tape was used at sentencing to establish a basis for assigning a vulnerable-victim enhancement to the base offense level pursuant to section 3A1.1(b) of the United States Sentencing Guidelines. Finally, an investigative survey of International Concepts's alleged victims revealed that 75% of the respondents, equaling approximately 70% of all victims, were older than 62.

## II.

### A. Expert Testimony

Brawner argues that the district court erred by allowing Agent Roberts to render expert testimony. In an argument completely unhelpful to this court and devoid of citation to relevant legal authority, the defendant argues that Roberts's opinion testimony was "grossly unfair" and "not necessary to determine if lying is occurring." It is, of course, well settled that "necessity" is not a condition precedent for the admissibility of opinion testimony under Federal Rule of Evidence 702; rather, the test is whether the opinion "will assist the trier of fact." The rule states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Fed. R. Evid. 702. Brawner complains that it was improper for Roberts to render an opinion concerning an ultimate issue in the case. But again, Brawner is mistaken. Federal Rule of Evidence 704(a) provides that "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Fed.R.Evid. 704(a).

■ As for the government's argument that Brawner waived any objection to Roberts's testimony, it is clear that a party must have preserved an issue at trial in order to challenge it on appeal, unless plain error exists such that the "substantial rights" of a party have been affected. *See* Fed.R.Crim.P. 52; Fed.R.Evid. 103(a)(1) and (d); *United States v. Bonds,* 12 F.3d 540, 554 (6th Cir.1993). Here, Brawner failed to object at trial when the government tendered Roberts as an expert, apparently choosing to rely on his earlier motion *in limine.*

The question of whether a party who has raised an evidentiary issue by motion *in limine* and lost must again object at trial in order to preserve appeal on the issue is one which has split the circuits and is the subject of a proposed amendment to Federal Rule of Evidence 103. For a discussion of the circuit splits and the proposed rule, *see* JONES, ROSEN, WEGNER AND JONES, FEDERAL CIVIL TRIALS AND EVIDENCE paras. 4:457–4:464 (The Rutter Group 1999). Some courts take the view that where an issue was thoroughly explored during hearing on the motion *in limine* and the trial court's ruling was explicit and definitive, no further action need be taken at trial to preserve the issue for appeal. *See, e.g., Palmerin v. City of Riverside,* 794 F.2d 1409, 1413 (9th Cir.1986); *American Home Assurance Co. v. Sunshine Supermarket, Inc.,* 753 F.2d 321, 324 (3d Cir.1985). Other circuits have required a party who has not prevailed on a motion *in limine* to object at trial when the contested evidence is offered in order to preserve the issue for appeal. *See, e.g., Marcel v.*

*Placid Oil Co.,* 11 F.3d 563, 567 (5th Cir. 1994); *Hendrix v. Raybestos–Manhattan, Inc.,* 776 F.2d 1492, 1503–1504 (11th Cir. 1985).

■ On balance, we believe the former is the better view as it reflects a practical, common-sense interpretation of Federal Rule of Evidence 103. The Federal Rules of Evidence, the Federal Rules of Criminal and Civil Procedure and interpretive rulings of the Supreme Court and this court all encourage, and in some cases require, parties and the court to utilize extensive pretrial procedures—including motions *in limine*—in order to narrow the issues remaining for trial and to minimize disruptions at trial. In furtherance of these objectives reflected in the rules and decisions, we hold that if the trial court has made an explicit and definitive ruling on the record of the evidentiary issues to be decided, and has not indicated that the ruling is conditioned upon any other circumstances or evidence, then counsel need not renew the objection at the time the evidence is offered (or would have been offered but for an exclusionary ruling) in order to preserve the error for appeal. However, if the court's ruling is in any way qualified or conditional, the burden is on counsel to raise objection to preserve error.

■ On the merits, we conclude that the district court did not err in admitting Roberts's opinion testimony. First, it is undisputed that Roberts was qualified as an expert in telemarketing fraud. Second, his testimony was helpful to the jurors in explaining the intricacies of telemarketing fraud, which by its nature depends upon the public's general ignorance of telemarketing schemes. Third, Brawner has failed to support his argument that Roberts testified that *all* telemarketing schemes, including Brawner's, are fraudulent. That simply is not a reasonable construction of Roberts's testimony. Finally, while Roberts's testimony was obviously prejudicial to Brawner, it was not unfairly prejudicial, and indis-

putably, it had substantial probative value. Roberts's expert opinion provided the jury with "specialized knowledge" to help it to decide whether Brawner's operations were fraudulent.

## B. Relevant Conduct

■ Brawner next challenges the amount of loss attributed to him as relevant conduct under the sentencing guidelines. We review for clear error a sentencing court's factual findings concerning the amount of loss for which a defendant is to be held accountable as relevant conduct pursuant to U.S.S.G. § 1B1.3(a)(1). *See United States v. Bingham*, 81 F.3d 617, 625 (6th Cir.1996). "The sentencing court's relevant conduct approximation must be based on reliable information and supported by a preponderance of the evidence." *Id.* (citing U.S.S.G. § 6A1.3(a)).

■ Postal Inspector Paul Busscher testified that the bank records of International Concepts reflected that it received funds from personal checks or money orders ranging from $50 to $699. At sentencing, the parties stipulated that National Marketing and International Concepts had combined gross sales totaling $2,743,-470.87, with net proceeds of $2,449,118.17. Eschewing both parties' recommendations for how the total loss should be calculated for sentencing purposes, the district court chose a third method. The court subtracted the sum of the value of the products/gifts shipped and of checks remitted but unpaid for insufficient funds, from the combined gross receipts to arrive at a *combined net* amount for both of Brawner's "businesses" of $2,249,789.73. Brawner contends, however, that the majority of the evidence presented at trial concerned the operations of International Concepts only, and that these operations constituted only 240 sales for a total of less than $100,000. Brawner urges that the sentencing court should have attributed only this amount to him as relevant conduct. Brawner maintains that it was clear error to factor in the sales of National Market-

ing because only four "customers" and one salesperson testified that National Marketing "victimized" its customers. In fact, he goes so far as to maintain that National Marketing was *per se* legitimate because it was registered with the California Attorney General.

Relevant conduct includes "all acts and omissions ... [of] the defendant; and ... all reasonably foreseeable acts and omissions of others ... that occurred during the commission of the offense of conviction...." U.S.S.G. § 1B1.3(a)(1)(A) & (B). In fraud cases, the relevant conduct includes the monetary loss perpetrated by the defendant. *See* U.S.S.G. § 2F1.1. Because the precise amount of the loss may be difficult to ascertain, various methods of fixing the total loss may be used. But, no matter what method is used, a "court need only make a reasonable estimate of the loss, given the available information." U.S.S.G. § 2F1.1, comment. (n.8) (Nov. 1995). This estimate "may be based on the approximate number of victims and an estimate of the average loss to each victim." *Id.* However, "[t]he offender's gain from committing the fraud is an alternative estimate that ordinarily will underestimate the loss." *Id.* Here, the parties stipulated to a combined gross gain, which the sentencing court used as a starting point in determining the total loss attributable to Brawner. The government complains that this gross gain should have been deemed the total loss; however, the guidelines provide that, "[i]n a case involving a misrepresentation concerning the quality of a consumer product, the loss is the difference between the amount paid by the victim for the product and the amount for which the victim could resell the product received." § 2F1.1, comment. (n.7(a)) (Nov.1995). Therefore, the sentencing court was correct when subtracting Brawner's actual cost of the "gifts" and merchandise from the gross gain. Still, this combined net gain probably underestimates the actual total loss. Moreover, "if an intended loss that the defendant was attempting to in-

flict can be determined, this figure will be used if it is greater than the actual loss." § 2F1.1, comment. (n.7) (Nov.1995).

Two factors in this case suggest that the intended loss exceeded the actual loss. First, as we have noted, some of the victims' checks were returned for insufficient funds. While these individuals were victims of Brawner's fraud—although in an ironic twist, they had "insufficient funds" to lose—the sentencing court nonetheless subtracted the value of the unredeemable checks from the gross receipts. Second, a box marked "no sale" was found full of discarded leads. The defendant intended, indeed attempted to, defraud these prospects as well. But the sentencing court did not take into account the potential gain from these intended victims. Thus, it appears that the sentencing court was, if anything, over-generous in attributing to Brawner only his net gain.

■ Brawner does not argue that it was improper for the court to attribute to him as additional loss the net proceeds from International Concepts. Rather, he contends that National Marketing was a legitimate operation. In support, Brawner argues, as we have said, that only four victims and one employee testified in court, and that the business was registered with the California Attorney General. Brawner's suggestion that not all of National Marketing's customers were victims misses the point for at least two reasons.

First, for the same reason that a jury ordinarily may convict on the testimony of a single witness, so too a sentencing court need not hear from all of the victims of a fraudulent scheme. It is enough that the evidence at Brawner's sentencing established a pattern, by a preponderance of the evidence, from which the court could infer that multiple targets were victimized. Second, there was nothing in the record to show that any customer was not a victim of the fraudulent one-in-five pitch. Even if some of Brawner's "customers" received the merchandise they ordered, or the prize they wanted, it would not alter the fact

that they were victims of fraud. It could be that some customers were easily pleased, or were angry at themselves for being taken, or were too embarrassed to come forward, or were simply unaware of what happened. Ignorance may be bliss, but it is not a defense.

There was sufficient evidence for the sentencing court to infer that Brawner's activities at National Marketing mirrored the activities at International Concepts. Indeed, the jury found Brawner guilty beyond a reasonable doubt of the acts charged in Count 1, which included running a "boiler room" operation called National Marketing, from June 1989 through May 1993, and included specific overt acts associated with that operation. Therefore, the sentencing court was justified in attributing to Brawner the losses from the National Marketing operation under the lesser, preponderance of the evidence standard. Brawner's argument that National Marketing was a legitimate business because it was registered with the California Attorney General hardly warrants comment. It suffices to say that it ought to be self-evident that compliance with state registration law is no assurance of a business's legitimacy.

## C. Victim Vulnerability

■ Brawner's final challenge is to the district court's decision to apply the vulnerable-victim enhancement to his sentence. We review a district court's findings regarding the vulnerability of a victim for clear error. *See United States v. Smith*, 39 F.3d 119, 122 (6th Cir.1994). A district court's factual findings for sentencing purposes need only be supported by a preponderance of the evidence. *Id.*

■ Brawner contends that the sentencing court clearly erred by imposing a two-level increase pursuant to section 3A1.1(b) of the sentencing guidelines. Section 3A1.1(b) provides: "If the defendant knew or should have known that a victim of the offense was unusually vulnerable due to age, . . . or that a victim was otherwise particularly susceptible to

the criminal conduct, increase by 2 levels." U.S.S.G. § 3A1.1(b) (Nov.1995). This court has previously conditioned the imposition of this enhancement on the requirement that a defendant actually have "targeted" a victim because of his or her vulnerability. *See Smith,* 39 F.3d at 122–24. The *Smith* court, noting a split in the circuits, reached this conclusion based in great part upon the guidelines commentary that stated: "This adjustment applies to offenses where an unusually vulnerable victim is made a target of criminal activity by the defendant." § 3A1.1, comment. (n.1) (Nov.1994).

Brawner also relies upon the "made a target" language in claiming he did not target his victims as vulnerable. However, Amendment 521, effective November 1, 1995, changed the application notes to section 3A1.1 to clarify the operation of section 3A1.1, specifically whether the victim must have been targeted by the defendant. *See* U.S.S.G.App. C, amend. 521, at 428–30 (Nov.1995). Amendment 521, *inter alia,* deleted the "made a target" sentence and replaced it with: "Subsection (b) applies to offenses involving an unusually vulnerable victim in which the defendant knows or should have known of the victim's unusual vulnerability." U.S.S.G. § 3A1.1, comment. (n.2) (Nov.1995). In amending the commentary, the Sentencing Commission acknowledged the *Smith* court's observation that there had been some inconsistency in the application of section 3A1.1 regarding whether the adjustment required proof that the defendant had targeted the victim on account of the victim's vulnerability. U.S.S.G.App. C, amend. 521, at 430 (Nov.1995). The Commission stated that the amendment's purpose was to clarify the application of section 3A1.1 as to that issue, *i.e.,* that there is no requirement that a victim have been "made a target" because of his or her vulnerability. *Id.; see United States v. Burgos,* 137 F.3d 841, 843–44 (5th Cir.1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 833, 142 L.Ed.2d 690 (1999); *United States v. Cain,* 134 F.3d 1345, 1351 (8th Cir.1998). This conclusion is buttressed by the unqualified mandate that "[i]f the fraud exploited vulnerable victims, an enhancement will apply." U.S.S.G. § 2F1.1, comment. (n.12) (Nov. 1995). Because the district court sentenced Brawner in accordance with the 1995 United States Sentencing Commission *Guidelines Manual,* Amendment 521 controls this issue. Thus, Brawner's argument that he was not shown to have "targeted" his victims as being unusually vulnerable, is without merit.

Brawner also argues that his customers were not vulnerable victims at all. We disagree. It is clear that Brawner's organizations targeted vulnerable people. First of all, the leads were people identified as willing to send in money in the hope of winning a valuable prize. These people were predisposed to the very scam Brawner was running; indeed, that is why he bought the "leads lists." This susceptibility is clearly covered in the guideline language, referring to "a victim ... otherwise particularly susceptible to the criminal conduct." § 3A1.1(b). The vulnerability of these people is also evident from the "reloading" process. Through the reloading process, those known to have already succumbed to the one-in-five scheme were contacted again and again, thereby further honing the original list. Moreover, the list contained the ages of the respondents, thereby enabling Brawner to exploit older people, who, according to the expert testimony of Roberts, are more susceptible to these scams. The susceptibility of the victims here was a known quantity from the start, only to be refined into a verified "sucker's" list through the reloading process. Ample evidence supports the conclusion that Brawner's victims were targeted because they were vulnerable.

### III.

Accordingly, we **AFFIRM** the conviction and sentence.