NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 14a0511n.06

No. 13-5897

## UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

FILED
Jul 11, 2014
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF TENNESSEE |
| JOHN THREADGILL, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |

BEFORE: GRIFFIN and DONALD, Circuit Judges; GRAHAM, District Judge.[*]

JAMES L. GRAHAM, District Judge. Over the course of 20 years, John Threadgill, a successful attorney, failed to pay income taxes owed to the United States Government. With his personal bank account potentially subject to levy by the IRS, Threadgill paid for a variety of personal expenses—including college and private school tuition, country club dues, and travel expenses—out of bank accounts for his law firm and several nominee trusts. Further, Threadgill titled various assets in the names of nominee trusts and used those trusts to conduct real estate transactions in a purported effort to conceal those assets from the IRS. After rejecting Threadgill's numerous offers to compromise his tax liability, the IRS initiated a multi-year investigation into Threadgill's finances. Based on the results of that investigation, the Government charged him in a single-count indictment with attempting to evade or defeat the

---

[*] The Honorable James L. Graham, United States Senior District Judge for the Southern District of Ohio, sitting by designation.

payment of a tax in violation of 26 U.S.C. § 7201.[1] The indictment charged Threadgill with the

following affirmative acts of evasion:

> 1. Using his law firm bank account and payroll account to issue checks to third parties for personal expenditures, thus disguising the existence and source of funds available to pay his assessed personal income taxes and thwarting attempts to collect such taxes;
>
> 2. Creating and maintaining ledgers that concealed the true nature of personal expenditures from his law firm account;
>
> 3. Establishing bank accounts in the names of nominee trusts and using such accounts to disguise the existence of assets, thus thwarting attempts to collect his personal income taxes; and
>
> 4. Titling his personal residences in the names of nominee trusts in an attempt to disguise the ownership of such residences and place them beyond the reach of creditors, including the Internal Revenue Service.

At the conclusion of trial, the jury convicted Threadgill of violating 26 U.S.C. § 7201. The

district court subsequently sentenced him to 51 months imprisonment. This appeal followed. We

AFFIRM the district court's judgment.

## I. Background

From 1985 to 2004, Threadgill failed to pay $1,437,176 in income taxes owed to the

United States Government. During this time period, Threadgill enjoyed a successful, and, at

times, lucrative legal career. Threadgill's tax problems began in October 1986 when he reported

a total tax liability of $156,680.84 for the 1985 tax year and failed to pay the balance owed.

Although he paid the balance in full in June 1987, the IRS conducted an audit of Threadgill's tax

return for 1985 and determined that he owed additional taxes. His tax liability increased

throughout the 1990s and early 2000s. During that time period, the IRS placed a lien on

---

[1]"Section 7201 covers both evasion of assessment and evasion of payment." *Kawashima v. Holder*, 132 S. Ct. 1166, 1179 (2012). Here, the Government charged Threadgill solely with evasion of payment under 26 U.S.C. § 7201.

Threadgill's property, and issued numerous "Collection Due Process Notice of Intent to Levy" letters to Threadgill. As his tax liability continued to increase, Threadgill made multiple offers of compromise to the IRS in an effort to settle his tax liability for significantly lower amounts than owed. The IRS rejected Threadgill's offers, except for one which he withdrew.

### A. *Threadgill's Finances and Accounting*

Throughout the relevant time period, Threadgill employed an accounting firm operated by Frank Addicks, a certified public accountant, to assist in the preparation of his personal and business tax returns. Addicks's firm did not provide any bookkeeping services for Threadgill. Instead, Threadgill provided Addicks a copy of his accounting ledgers, which Addicks's firm used to prepare Threadgill's tax returns. Andrea Mize, a certified public accountant, assisted Addicks in the preparation of Threadgill's returns. After preparing his returns, Addicks's firm would provide an instructional letter to Threadgill informing him of his tax liability and instructing him on how to file his return.

Crystal White worked as Threadgill's office manager from late 2000 to mid-2002. Her duties included performing bookkeeping, processing payroll, and providing financial information to Addicks and Mize. As part of her responsibilities, Crystal White assisted Threadgill in the payment of his personal expenses.

Threadgill paid a variety of personal expenses out of his law firm's bank account. These personal expenses included school tuition, personal vehicles, vacation expenses, and real estate. In the firm's accounting ledgers, Threadgill categorized these expenditures as "management fees," "loans to JOT,"[2] and "cafeteria plan benefits."[3] Threadgill also compensated himself in the

---

[2]The defendant's initials are JOT.

[3]Threadgill instructed Crystal White to categorize his children's tuition payments as cafeteria plan benefits for accounting purposes.

form of "management fees." Compensation in the form of management fees was not subject to withholding, but was attributed as personal income to Threadgill for purposes of calculating his taxes. Addicks did not instruct Threadgill on how to compensate himself from his law firm's earnings.

Further, Threadgill placed family members on the firm's payroll despite them not actually performing any work for the firm. On several occasions, Threadgill instructed Crystal White to write checks on the firm's account to a nominee trust. Towards the end of Chrystal White's employment, Threadgill withdrew money from the firm's account every few days and directed White to categorize those withdrawals as "loans to JOT".

### B.     *Threadgill's Real Estate Transactions*

In April 2000, Threadgill purchased a parcel of property at 3523 Captain's Way in a subdivision outside Knoxville, Tennessee on behalf of the ELM Family Educational Trust. At the time of purchase, the property was undeveloped. In June 2003, Threadgill sold the Captain's Way property on behalf of the ELM Family Educational Trust and received a check for $60,000. Threadgill deposited the check in the ELM Family Educational trust bank account and proceeded to spend that money on a variety of personal expenses.

In August 2002, Threadgill entered into a lease/purchase agreement for a condominium at 1005 Water Place in Gettysvue Golf Community. The seller was Lynda White. The agreement obligated Threadgill to close within one year, pay earnest money, and make monthly payments. Threadgill made his monthly payments with checks drawn on his law firm's bank account. As a result of his financial difficulties, Threadgill was unable to purchase the home within a year of the agreement being signed. Consequently, the parties executed an addendum to the agreement providing that he would close on the property by July 1, 2004. With the threat of eviction

looming, Threadgill financed the purchase of the Water Place condo with a home loan and cashier's check made payable to his law firm.

### C.    *IRS Investigation*

In late 2005, the IRS began investigating Threadgill for the purposeful evasion of the payment of income taxes. The IRS designated Threadgill's cases as a potential Abusive Tax Avoidance Transactions (ATAT) case. An ATAT revenue officer, Jane Lethco, conducted the initial investigation into Threadgill's finances. As part of such a financial analysis, Lethco looked for indicators of fraud, such as the concealment of assets or the mixing of business and personal assets.

Upon initial review, Lethco noted that Threadgill was an attorney and that his non-payment of taxes dated back 20 years. Lethco considered these facts to be indicative of fraud and was also surprised by the fact that Threadgill owed $2,500,000 in past-due taxes. Based on these facts, she brought the case to her manager's attention.

After consulting with her manager, Lethco contacted a fraud technical advisor at the IRS to determine if the case should potentially be forwarded to a criminal agency. On December 20, 2005, Lethco initiated a field contact with Threadgill at his Water Place condo. Lethco knocked on the door of the condo but no one answered the door. As required, she then left a business card that provided Threadgill with her contact information and notices advising Threadgill of his tax liability and his rights as a taxpayer.[4]

After attempting to contact Threadgill, Lethco traveled to the county courthouse to investigate whether Threadgill owned any property in the county. Upon investigation, Lethco determined that the Water Place condo was titled in Threadgill's and his wife's name. Two days

---

[4]Threadgill later called Lethco and informed her that he received the notice but was unable to pay the full amount of taxes owed.

after Lethco's attempted field contact, on December 22, 2005, Threadgill transferred the Water Place condo by quit-claim deed to a nominee trust.

Karen Bjorkman was the lead agent in the criminal investigation of Threadgill. As part of her investigation, Bjorkman compiled and reviewed thousands of documents, including records from Threadgill's bank, accountants, and the IRS. Bjorkman reviewed these documents to determine Threadgill's ability to pay taxes and to resolve whether he was concealing assets from the IRS.

Karen Jackson, an internal revenue agent, assisted Bjorkman in the criminal investigation of Threadgill. Educated as an accountant, Jackson audited individual, corporate, and partnership tax returns to determine if a taxpayer was paying the correct amount of taxes. In analyzing Threadgill's finances, Jackson focused on his payment of personal expenses in an effort to determine his ability to pay taxes. She reviewed a variety of sources, including Threadgill's accounting ledgers, personal and corporate bank account records, and tax returns for the years 2000 through 2006. Jackson testified that Threadgill consistently paid a variety of personal expenses out of his corporate bank account.

D.     *Indictment and Trial*

On June 21, 2011, the United States indicted Threadgill on a single count of attempting to evade or defeat the payment of a tax in violation of 26 U.S.C. § 7201. The jury trial began on November 6, 2012. At the outset of the trial, the Government introduced voluminous documentary evidence detailing Threadgill's assessment and payment of income taxes. To support its charge of willful evasion of the payment of taxes, the Government presented 13 witnesses that testified regarding a variety of subjects, including Threadgill's personal finances, accounting, and real estate transactions. Three of the witnesses—Lethco, Jackson, and

Bjorkman—testified at length regarding the IRS's investigation of Threadgill. Jackson and

Bjorkman prepared summaries of their work which were admitted into evidence. Threadgill did

not present evidence in his own defense. At the conclusion of trial, the jury convicted Threadgill

of violating 26 U.S.C. § 7201. The district court subsequently sentenced him to 51 months

imprisonment.

## II.    Discussion

Threadgill timely appealed his conviction, and raises four issues on appeal:

1. Was the indictment constructively amended where the Government's trial theory, and evidence emphasized at trial, differed from the conduct covered by the language of the indictment?

2. Should a judgment of acquittal be entered where there was insufficient evidence to establish the one alleged affirmative act of evasion that fell within the applicable statute of limitations, as any conclusion that the defendant transferred his residence into a trust in order to place the property beyond the reach of the IRS could be reached only by impermissible conjecture?

3. Should a judgment of acquittal be entered where there was insufficient evidence to establish any of the four alleged affirmative acts?

4. Did the District Court err in allowing the Government's investigating agents, testifying as fact witnesses, to present reports containing summaries of the Government's case and to offer testimony regarding the conclusions the jury should draw from the evidence, including conclusions regarding the defendant's knowledge, mental state, and intent?

Appellant's Br. at 12. We address each of these arguments in turn.

### A.    *Constructive Amendment of the Indictment/Variance*

Threadgill first argues that the Government constructively amended the indictment

because the Government's theory at trial was inconsistent with the language of the second

affirmative act charged in the indictment. Alternatively, he asserts that the Government's

conduct amounted to a prejudicial variance that warrants a new trial. Although the indictment

charged Threadgill with "[c]reating and maintaining ledgers that concealed the true nature of

personal expenditures from his law firm account," he argues the Government relied on the theory that he paid himself "management fees" out of his firm's bank account to avoid paying withholding taxes as a basis for his conviction. Threadgill concedes that the theory that he paid himself management fees to avoid paying withholding taxes could potentially constitute a basis for liability under 26 U.S.C. § 7201. But, Threadgill emphasizes, no such affirmative act or theory was charged in the indictment. In Threadgill's view, the payment of salary in the form of management fees to avoid withholding has nothing to do with "[c]reating and maintaining ledgers that concealed the true nature of personal expenditures from his law firm account." Therefore, Threadgill argues that the Government constructively amended the second alleged affirmative act based on its reliance on this alternative theory.

This Court generally reviews de novo whether there was a constructive amendment or variance to an indictment. *United States v. Pritchett*, 749 F.3d 417, 428 (6th Cir. 2014) (citing *United States v. Budd*, 496 F.3d 517, 521 (6th Cir. 2007)). "However, where no specific objection is raised regarding a constructive amendment or a variance before the district court, we are limited to 'plain error' review on appeal." *United States v. Smith*, 749 F.3d 465, 481 (6th Cir. 2014) (internal quotation marks and citation omitted). Here, Threadgill raised a specific objection to the alleged constructive amendment or variance before the district court in his Motion to Preclude Government from Making Improper Argument. We review the issue de novo accordingly.

"When allegations in an indictment differ from the evidence offered at trial, this court considers three separate but related theories of constitutional relief: an amendment, a variance, 'and a third category lying between the other two—a constructive amendment.'" *Smith*, 749 F.3d at 481 (quoting *United States v. Hynes*, 467 F.3d 951, 961 (6th Cir. 2006)). A constructive

amendment occurs "'when the terms of an indictment are in effect altered by the presentation of evidence and jury instructions which so modify essential elements of the offense charged that there is a substantial likelihood that the defendant may have been convicted of an offense other than that charged in the indictment.'" *United States v. Chilingirian*, 280 F.3d 704, 712 (6th Cir. 2002) (quoting *United States v. Barrow*, 118 F.3d 482, 488 (6th Cir. 1997)).

> [A] defendant can prove a constructive amendment only by pointing to a combination of evidence *and* jury instructions that effectively alters the terms of the indictment and modifies the essential elements of the charged offense to the extent that the defendant may well have been convicted of a crime other than the one set forth in the indictment.

*Hynes*, 467 F.3d at 962 (citing *United States v. Combs*, 369 F.3d 925, 936 (6th Cir. 2004)); *Chilingirian*, 280 F.3d at 712; *United States v. Suarez*, 263 F.3d 468, 478 (6th Cir. 2001)). "[C]onstructive amendments are deemed 'per se prejudicial' because they 'infringe[ ] upon the Fifth Amendment's grand jury guarantee.'" *Hynes*, 467 F.3d at 962 (quoting *Chilingirian*, 280 F.3d at 712).

"The difference between a variance and a constructive amendment is a matter of degree." *Smith*, 749 F.3d at 481. "'A variance to the indictment occurs when the charging terms of the indictment are unchanged, but the evidence at trial proves facts materially different from those alleged in the indictment.'" *United States v. Adams*, 722 F.3d 788, 805 (6th Cir. 2013) (quoting *United States v. Caver*, 470 F.3d 220, 235 (6th Cir. 2006)). Although a constructive amendment is per se prejudicial, a defendant who establishes the occurrence of a variance must further demonstrate "that variance affected the defendant's substantial rights." *Adams*, 722 F.3d at 805 (citing *United States v. Swafford*, 512 F.3d 833, 841 (6th Cir. 2008)). In the context of a variance, "[s]ubstantial rights are affected only when a defendant shows prejudice to his ability to defend himself at trial, to the general fairness of the trial, or to the indictment's sufficiency to

bar subsequent prosecutions." *Barrow*, 118 F.3d at 488–89 (citation and quotation marks omitted).

We have recognized that "a different distinction operates in cases in which the difference between indictment and jury instructions is not the facts of the offense, but the legal theory." *Budd*, 496 F.3d at 522.

> The key question in determining whether such a case involves a variance or a constructive amendment is whether the offense described by the indictment and the one described by the jury instructions are two alternative crimes or merely two alternative methods by which the one crime . . . could have been committed.

*Id*. (internal citations, quotations, and alterations omitted). The burden is on Threadgill to prove "that a variance has occurred and that the variance rises to the level of a constructive amendment." *Hynes*, 467 F.3d at 962 (citing *Chilingirian*, 280 F.3d at 712).

Threadgill has not satisfied this burden here. The central flaw in Threadgill's positions is that § 7201 requires proof of only a single affirmative act of evasion. *See United States v. Heath*, 525 F.3d 451, 456 (6th Cir. 2008). The indictment's recitation of multiple affirmative acts is an enumeration of multiple "alternative methods by which the one crime . . . could have been committed," *Budd*, 496 F.3d at 522, meaning that there is no chance that Threadgill was convicted of an offense for which he was not indicted. *See United States v. Miller*, 471 U.S. 130, 140 (1985) (noting that the defendant's "complaint is not that the indictment failed to charge the offense for which he was convicted, but that the indictment charged more than was necessary."). In any event, Threadgill makes no argument that the jury instructions included the Government's alternative theory or charged the jury on an alternative crime. Our review of the jury instructions confirms that the offense described by the indictment was identical to the one described by the jury instructions. Nor has Threadgill demonstrated any prejudice stemming from the purported

variance of proof. Therefore, Threadgill has failed to establish a constructive amendment or variance that warrants reversal in this case. *See Budd*, 496 F.3d at 522.

### B.      *Statute of Limitations*

Threadgill next argues that a judgment of acquittal should be entered because there is insufficient evidence of any affirmative act being committed within the six-year statute of limitations. The fourth affirmative act—titling his personal residences in the names of nominee trusts in an attempt to disguise the ownership of those residences—is the only affirmative act alleged to have been committed within the six year statute of limitations. Threadgill maintains that evidence of him titling his personal residences in the name of nominee trusts did not demonstrate any intent on his part to evade payment of taxes.

Under 26 U.S.C. § 7201, the statute of limitations begins to run on the day of the last affirmative act of tax evasion. *United States v. Butler*, 297 F.3d 505, 511 (6th Cir. 2002). In this case, the statute of limitations was six years because the Government alleged that Threadgill willfully attempted to evade or defeat the payment of income taxes. *See* 26 U.S.C. § 6531(2). The Government indicted Threadgill on June 21, 2011. Therefore, the Government was obligated to demonstrate that Threadgill committed at least one affirmative act in furtherance of the evasion of payment of taxes after June 21, 2005. *See id.*

At trial, the Government presented evidence regarding Threadgill's titling of his Water Place condo in the name of a nominee trust in December 2005. As part of the initial IRS investigation, revenue officer Lethco attempted to contact Threadgill in person at his Water Place condo on December 20, 2005. No one was home at the Water Place condo at the time of Lethco's attempted field collection effort. At that time, Lethco left Threadgill a business card with her contact information and notices informing him how much he owed in taxes. After

attempting to contact Threadgill, Lethco traveled to the county courthouse to research Threadgill's property records. Property records indicated that the Water Place condo was titled in Threadgill's and his wife's name. Threadgill later verified that he had received the notice left for him by Lethco. Two days after Lethco's visit to his residence, on December 22, 2005, Threadgill transferred the Water Place condo to a nominee trust by quit-claim deed.

The Government elicited testimony explaining the significance of Threadgill's transfer of title to the Water Place condo to the nominee trust. Lethco testified that she conducted an initial analysis of Threadgill's case with the aid of an IRS computer program, Accurant. Accurant provides, among other things, basic information about a taxpayer, including details about their work history, prior tax liens and tax judgments against them, and property ownership. According to Lethco, a property titled in the name of a nominee trust would not be found in a search for property owned by Threadgill.

Lethco further explained the IRS's use of liens and levies to collect unpaid taxes. Relevant here, she discussed the concept of a nominee lien:

> [A] nominee lien is for the purpose of advising creditors . . . that a particular property, although it may be titled in an unrelated name or in the name of an unrelated entity, it's to advise them that somehow it is tied to the taxpayer. When we, as [the] IRS, define something as nominee, it's basically when property is titled in the name of another entity, but it really belongs to the taxpayer.

Lethco testified that the IRS could place a lien on a nominee's property, but that it was a "complicated process" that would require a thorough investigation and consultation with legal counsel and numerous supervisors at the IRS. Bjorkman corroborated Lethco's testimony and explained that the transfer of the Water Place condo to a nominee trust made it more difficult to collect delinquent taxes from Threadgill.

When considering a defendant's sufficiency of the evidence challenge, we view the evidence "in the light most favorable to the government," *United States v. Arnold*, 486 F.3d 177, 180 (6th Cir. 2007) (en banc) (internal quotation marks omitted), and ask whether "*any* rational trier of fact could have found the elements of the crime beyond a reasonable doubt," *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Here, the Government presented testimony that the use of nominee trusts made it more difficult to determine ownership of property and more difficult to collect taxes. Threadgill transferred the Water Place condo to a nominee trust two days after an IRS agent visited the condo. The temporal proximity of the transfer of the Water Place condo with Lethco's visit is suspicious in and of itself. It is doubly so when combined with evidence of Threadgill's occupation as a lawyer and his extensive history with the IRS, including the prior placement of tax liens on his property. Construing these facts in the light most favorable to the prosecution, a rational jury could have inferred that such actions demonstrated an intent to evade the payment of taxes within the statute of limitations set forth in 26 U.S.C. § 6531(2).

Threadgill nonetheless maintains that the December 22 transfer of the Water Place condo was not a panicked response to Lethco's visit. In support of this argument, he notes that he previously titled the Captain's Way residence in the name of a trust and that he made the down payment on the Water Place condo from a trust account. Presumably, Threadgill cites these facts as evidence he regularly used trusts to conduct legitimate business transactions. Threadgill presented this evidence to the jury, and the jury was free to evaluate the significance of this evidence when determining whether he possessed the requisite intent to evade the payment of taxes in transferring the Water Place condo to a nominee trust. The fact that the jury did not draw the desired inference from Threadgill's account of the evidence does not render his conviction invalid for want of sufficient evidence.

13

Further, Threadgill argues the Government failed to present evidence that the transfer of the Water Place condo was likely to mislead or conceal ownership of the residence or to prevent the IRS from collecting taxes from Threadgill. But, as Lethco and Bjorkman testified, titling property in the name of a nominee trust would, in fact, make it more difficult to determine ownership of the property and make it more difficult to collect taxes from a property owner. Significantly, the indictment charged Threadgill with attempting to disguise the ownership of his residence and placing it beyond the reach of creditors. The Government was not obligated to prove that Threadgill was successful in his attempt, and his argument to the contrary is meritless. *See United States v. Gross*, 626 F.3d 289, 298 (6th Cir. 2010) ("Even if the IRS was likely eventually to uncover Gross's fraud, however, this does not change the fact that the W–4 forms themselves could initially mislead the IRS. Section § 7201 merely requires attempted evasion, and nothing within it requires that a tax evader's overall scheme must be likely to succeed.").

We therefore find that there was sufficient evidence of an affirmative act having been committed within the statute of limitations.

## C.    *Insufficient Evidence*

Threadgill next challenges the sufficiency of the evidence as to each affirmative act charged in the indictment. "A Rule 29 motion is properly preserved for appeal when a defendant makes a 'motion for acquittal at the end of the prosecution's case-in-chief and at the close of evidence.'" *Kuehne*, 547 F.3d at 696 (quoting *United States v. Chance*, 306 F.3d 356, 368–69 (6th Cir. 2002)). Before the district court, Threadgill moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 at the conclusion of the Government's case, renewed his motion for acquittal at the conclusion of the presentation of evidence, and filed a post-trial motion for judgment of acquittal. Threadgill therefore properly preserved his Rule 29 motion for

appeal, *see Kuehne*, 547 F.3d at 696, and we review his sufficiency of the evidence challenges de novo, *United States v. Gunter*, 551 F.3d 472, 482 (6th Cir. 2009).

We may overturn a jury verdict "only if, after 'viewing the evidence in the light most favorable to the prosecution, [no] rational trier of fact could have found the elements of the crime beyond a reasonable doubt.'" *United States v. Dimora*, 750 F.3d 619, 625 (6th Cir. 2014) (quoting *Jackson*, 443 U.S. at 310). "Circumstantial evidence alone is sufficient to support a conviction, and '[i]t is not necessary for the evidence to exclude every reasonable hypothesis except that of guilt.'" *United States v. Reed*, 167 F.3d 984, 992 (6th Cir. 1999) (quoting *United States v. Beddow*, 957 F.2d 1330, 1334 (6th Cir. 1992)). "In examining claims of insufficient evidence, this Court does not 'weigh the evidence presented, consider the credibility of witnesses, or substitute [its] judgment for that of the jury.'" *Gunter*, 551 F.3d at 482 (quoting *United States v. M/G Transp. Servs., Inc.*, 173 F.3d 584, 588–89 (6th Cir. 1999)). Consequently, a defendant bringing such a challenge bears a "very heavy burden," *United States v. Daniel*, 329 F.3d 480, 485 (6th Cir. 2003) (citation omitted), to overcome the "strong presumption in favor of sustaining a jury conviction," *United States v. Peters*, 15 F.3d 540, 544 (6th Cir. 1994).

As pertinent here, a conviction under 26 U.S.C. § 7201 requires proof of: (1) willfulness; (2) the existence of a tax deficiency; and (3) an affirmative act constituting an evasion or attempted evasion of payment of a tax. *Boulware v. United States*, 552 U.S. 421, 424 n.2 (2008). In the context of criminal tax cases, willfulness is defined as "requir[ing] the Government to prove that the law imposed a duty on the defendant, that the defendant knew of this duty, and that he voluntarily and intentionally violated that duty." *Cheek v. United States*, 498 U.S. 192, 201 (1991). The issue of intent is central to Threadgill's sufficiency of the evidence challenges.

First, Threadgill argues that the Government failed to present evidence that he paid for personal expenses out of his law firm's bank account with the intent to evade the payment of taxes. Threadgill concedes that he used his law firm's bank account to pay for personal items, but maintains that the money was nonetheless disclosed as income on his personal return. Therefore, he concludes that the money was not disguised from the IRS and that he did not intend to evade the payment of taxes.

Evidence at trial demonstrated that the IRS issued numerous "Collection Due Process Notice of Intent to Levy" letters to Threadgill and that Threadgill paid a variety of personal expenses out of his law firm's bank account. Lethco, Jackson, and Bjorkman explained the consequences of paying personal expenses out of a business, as opposed to personal, account. Their testimony established that the IRS generally could not place a levy on a business bank account to collect taxes owed by an individual taxpayer unless they demonstrated that the taxpayer was commingling personal and business funds. Further, by paying personal expenses out of his business account, Threadgill avoided placing those funds in his personal bank account, which would have been subject to levy by the IRS. A rational trier of fact could have found that Threadgill willfully evaded the payment of taxes in light of this evidence. *See United States v. Farr*, 701 F.3d 1274, 1286 (10th Cir. 2012) (finding that the defendant's payment of personal living expenses out of a corporate account which she controlled was consistent with an attempt to conceal income and assets from the IRS and evade the payment of taxes).

Threadgill's challenges to this conclusion are unpersuasive. First, he notes that the Government has no direct evidence that he paid for personal expenses out of his law firm's account with the intent to disguise the existence and source of funds available to pay the IRS. But it is well-established that "[c]ircumstantial evidence alone is sufficient to support a

conviction," *Reed*, 167 F.3d at 992, and the lack of direct evidence is therefore of little import here. Second, Threadgill asserts that, although he paid personal expenses out of his business account, those expenses were nonetheless reported as income on his annual tax return. This argument is beside the point. By paying his personal expenses out of his business account, rather than out of his personal account, Threadgill avoided those funds being subject to levy by the IRS. Third, Threadgill argues that there is no evidence that the IRS ever placed a levy on his personal bank account and no evidence that he believed they would. Here, the Government presented evidence that Threadgill received numerous notices of intent to levy and that much of the Government's collection efforts were delayed by Threadgill's repeated offers of compromise. A rational jury could reasonably infer that Threadgill was afraid that would the IRS would renew its collection efforts against him and potentially levy his personal bank account and that the payment of personal expenses from his law firm account was an effort to avoid those funds being subject to levy.

Second, Threadgill argues that there is insufficient evidence to support the allegation that he created and maintained ledgers that concealed the true nature of personal expenditures from his law firm account and that he did so with wrongful intent. In Threadgill's view, the limited evidence presented by the Government demonstrated that he did not intend to conceal his payment of personal expenditures from his law firm's account through his bookkeeping system. Rather, Threadgill argues, the evidence shows that he identified personal expenses in his accounting ledgers, and his accountant attributed those expenses to him as income for purposes of his tax return. Finally, Threadgill emphasizes that he prepared the accounting ledgers for his accountant to use in the preparation of his tax returns. According to Threadgill, he did not

prepare the accounting ledgers in an effort to "hoodwink" the Government because he never intended for the Government to view the ledgers in the first place.

In *Spies v. United States*, the Supreme Court discussed the types of actions that would qualify as affirmative acts of tax evasion:

> affirmative willful attempt may be inferred from conduct such as keeping a double set of books, making false entries or alterations, or false invoices or documents, destruction of books or records, concealment of assets or covering up sources of income, handling of one's affairs to avoid making the records usual in transactions of the kind, and any conduct, the likely effect of which would be to mislead or to conceal.

317 U.S. 492, 499 (1943). Here, the Government alleged that Threadgill created and maintained ledgers that concealed the true nature of personal expenditures from his law firm account. At trial, the Government introduced evidence showing that Threadgill categorized various personal expenditures as "management fees," "loans to JOT," and "cafeteria plan benefits" in the firm's accounting ledgers. Addicks and Mize, Threadgill's accountants, relied on these ledgers in preparing Threadgill's taxes. Threadgill's accountants considered these personal expenses as income for purposes of his annual tax return, but because he categorized those personal expenses as management fees, loans, or cafeteria plan benefits, those expenses were not subject to withholding. To determine Threadgill's ability to pay taxes, Agent Jackson engaged in a time-consuming review of Threadgill's accounting ledgers. Because of the unreliable and misleading nature of Threadgill's accounting ledgers, Jackson was obligated to review a variety of sources, including personal and corporate bank account records and tax returns for the years 2000 through 2006, to corroborate her findings regarding his ability to pay taxes. In our view, a jury could have found that Threadgill's accounting ledgers made it more difficult for Jackson to perform her job responsibilities and, in turn, made it more difficult for the IRS to collect taxes from him.

Consequently, we find that the Government presented sufficient evidence as to the second affirmative act charged in the indictment.

Third, Threadgill argues that there was insufficient evidence to support the allegation that he used bank accounts in the name of trusts to disguise the existence of assets and thwart attempts to collect income taxes. Threadgill concedes that he used bank accounts in the name of trusts for a variety of purposes, including the payment of personal expenses, but maintains that there is "scant" evidence that he did so with the intent of evading the payment of taxes and that any inference drawn by the jury to the contrary constituted "impermissible guesswork."

We disagree. At trial, Jackson and Bjorkman testified regarding Threadgill's use of trust bank accounts. Threadgill had three different bank accounts for two nominee trusts. Most of the deposits in those accounts came from his law firm's corporate account. Bjorkman testified that two of the three nominee trusts were for educational expenses, but noted that Threadgill paid the majority of his family's educational expenses out of his law firm's account.

Threadgill used these nominee trust accounts to store assets and pay for a variety of personal expenses, including the purchase of real estate. In April 2000, Threadgill purchased the Captain's Way property in the name of ELM Family Educational Trust. Later, he sold the Captain's Way property and received a check for $60,000. He then deposited the check in the nominee trust bank account and proceeded to spend that money on a variety of personal expenses. In October 2005, Katherine Norwood paid Threadgill a $100,000 retainer for legal services by check. With that check from Norwood, Threadgill purchased a $100,000 cashier's check, which he deposited into the ELM Family Trust account. Threadgill then removed $159,320.29 from the ELM Family Trust account to place a down payment on the Water Place condo and pay the real estate agent's commission. As with his payment of personal expenses

19

from a law firm account, a rational jury could have concluded that Threadgill used these nominee trust accounts to store and conceal assets and pay personal expenses rather than place those assets in his personal bank account where they would potentially be subject to levy by the IRS.

We have already concluded that Threadgill's sufficiency of the evidence argument fails as to the fourth affirmative act. *See supra* Part II, Section B.

In light of the foregoing, we conclude that the Government presented sufficient evidence to sustain Threadgill's conviction under 26 U.S.C. § 7201.

D.     *Evidentiary Rulings*

Threadgill next challenges two evidentiary rulings made by the district court. In Threadgill's view, the district court erred when it permitted the Government to: (1) introduce summary exhibits that were essentially written theories of its case to the jury and (2) present the direct testimony of IRS agents concerning his knowledge, intent, and mental state. He maintains that "the Government was allowed to present, in the guise of the testimony and records of 'fact' witnesses, the exact inferences and conclusions that it wanted the jury to reach." We address the admission of the written summaries and direct testimony separately.

We "typically review a district court's evidentiary rulings for an abuse of discretion." *United States v. Clay*, 667 F.3d 689, 693 (6th Cir. 2012) (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 141 (1997)). However, if "a defendant neglects to mount an objection to evidence at trial, he is precluded from arguing on appeal that its admission was flawed unless its allowance constituted plain error." *United States v. Carney*, 387 F.3d 436, 453 (6th Cir. 2004).

### 1. Summary Exhibits

At trial, the district court admitted summaries prepared by Jackson and Bjorkman over Threadgill's objection.[5] Threadgill now argues that the summaries were written versions of the Government's theory of the case and should not have been admitted into evidence.

Threadgill provides limited support for his argument. According to Threadgill, "the Government [may not] use a witness to introduce into evidence a written version of its theory of the case." Our sister circuits have cautioned that it is an abuse of discretion to "admit into evidence and send to the jury room government agent case summaries which constitute a written summary of the government's theory of the case." *United States v. Pendas-Martinez*, 845 F.2d 938, 941 (11th Cir. 1988) (citing *United States v. Brown*, 451 F.2d 1231 (5th Cir. 1971)). *Accord Sanchez v. United States*, 293 F.2d 260, 267–70 (8th Cir. 1961); *United States v. Ware*, 247 F.2d 698, 700 (7th Cir. 1957). This statement of the law may be correct as a general proposition, but "[g]eneral propositions do not decide concrete cases," *Lochner v. New York*, 198 U.S. 45, 76 (1905) (Holmes, J., dissenting).

Threadgill emphasizes that Jackson's summary contained spreadsheets detailing her review of his finances, but also her "observations and conclusions regarding those documents." However, Threadgill does not identify the specific observations and conclusions with which he takes issue, and he makes no effort to explain why or how those observations and conclusions

---

[5]The district court and the parties did not identify a basis for admitting the summaries into evidence. On appeal, the Government explicitly invokes Rule 1006 as the basis for their admission. See Appellee's Br. at 37 ("It is well-settled that a party may present 'a summary, chart, or calculation to prove the content of voluminous writings . . . that cannot be conveniently examined in court,' so long as the original (or duplicates) are made available to the other party and can be produced in court, if ordered by the court. Fed. R. Evid. 1006."). Threadgill appears to recognize that Rule 1006 was the basis for the summaries' admission as well. See Appellant's Br. at 60 ("To the extent that these documents merely represented summaries of otherwise voluminous records, under Rule 1006, they might have been admissible. However, they went much further than that.").

could be considered a written summary of the Government's theory of the case. We will not make these arguments for Threadgill.

Threadgill also stresses that Bjorkman's summary included a chronology of events "that essentially distilled the events that she found relevant to the charges in this case" and contained information of which she did not have personal knowledge. Again, he does not explain the significance of these alleged deficiencies. Nor does he provide any explanation or cite case law to support his conclusory statement that Bjorkman's summary "was, essentially, an outline or condensation of the Government's case." Threadgill's challenge to the admission of the summary exhibits is therefore without merit.

2.      Opinion Testimony

Finally, Threadgill claims that the district court erred when it admitted testimony from Jackson and Bjorkman regarding Threadgill's knowledge, intent, and state of mind. In Threadgill's view, this was impermissible opinion testimony. Given the voluminous documentary evidence in this case, Threadgill insists that the jury relied heavily on this testimony in convicting him and that therefore the admission of this testimony was not harmless error.

The Government maintains that Jackson and Bjorkman did not give improper opinion testimony. Instead, it argues that, when viewed in context, the testimony at issue was concerned with facts rather than personal opinion. The Government claims that Bjorkman's opinion testimony was "arguably" admissible under Federal Rule of Evidence 701. Moreover, the Government emphasizes, Threadgill failed to object to the alleged improper testimony and that therefore we review its admission only for plain error.

In reply, Threadgill notes the conclusory nature of the Government's argument and questions the Government's premise that Bjorkman's opinion testimony was admissible because it was couched in a discussion of facts related to her investigation. Contrary to the Government's argument that plain error review applies, Threadgill contends that he adequately raised these arguments below and preserved the issue for appeal. Therefore, he maintains that the appropriate standard of review is for abuse of discretion and harmless error.

The resolution of Threadgill's claim turns on whether he properly preserved this issue on appeal. Here, Threadgill challenges two statements made by Bjorkman during her direct testimony. On direct, the Government discussed the elements of tax evasion with Bjorkamn:

> AUSA: In your training and experience as a special agent, what do you understand to be the elements of tax evasion as it relates to evasion of payment?
>
> Bjorkman: Well, there has to be a significant amount of tax due and owing, which, in this case, as you have heard, there was. *There has to be a knowledge that the person is required to pay these taxes and I believe Mr. Threadgill has that knowledge*. He has upper education, he's an attorney. He told Andrea Mize that he has an accounting degree.
>
> He filed his returns and signed his returns. He sent a letter to Lynda White, saying he needed to call the payments to her "interest" so he could deduct them on his return. *So I believe that he had the knowledge to know that he was obligated to pay those, his taxes.*

(R. 73, Page ID# 870) (emphasis added). Later in her direct testimony, the Government questioned Bjorkman regarding the second affirmative act charged in the Indictment:

> AUSA: Let's go back to the indictment and, among the affirmative acts of evasion there is a reference [to] creating and maintaining ledgers to conceal the true nature of personal expenditures from the law firm account. Okay. You spoke earlier to the use of management fees and loans to Mr. Threadgill. How is this consistent to the tax evasion purpose?

> Bjorkman:    Well, if Mr. Threadgill was taking money and classifying them as loans when they were actually income to you, that would be an inaccurate or false ledger item. In addition to that, *to conceal his payments to Webb School, he lumped it in a category called "cafeteria benefits," which is – that would be hiding what the true purpose of the loans were.*

(Id. at 885) (emphasis added). In Threadgill's view, these two statements constitute improper opinion testimony regarding his intent to evade the payment of taxes.

Significantly, Threadgill did not object to either of these statements at trial. He nonetheless insists that, "[i]n the context of the entire 'sequence of events,' *Osborne v. Ohio*, 495 U.S. 103, 123–25 (1990), . . . [he] adequately raised the issue and was rejected by the Court." Appellant's Reply at 14. Although Threadgill concedes that he did not object to every improper statement by Jackson and Bjorkman, he maintains that the district court was well aware of the relevant issue and that we should therefore review the admission of Bjorkman's testimony for an abuse of discretion.

After reviewing Threadgill's objections at trial, we disagree. After Jackson testified regarding her analysis of Threadgill's finances, Threadgill generally objected:

> We are about to get into some expert testimony, I believe, some conclusions from this witness. We have asked, on the Rule 16, to be given, you know, the fact basis of the conclusions of the expert testimony, haven't receive it. We've gotten a lot of discovery, and in all candor, we've gotten a lot of discovery from her, all kinds of charts and drafts.
>
> But she's not been qualified as an expert, and she's fixing to give opinions, and I object. Up until now, she's been factual, what she considered. But when she reaches the conclusion area, that's opinion testimony, and she's not qualified, nor have we been supplied.

(R. 72, Page ID# 817). After hearing argument on the issue, the district court disagreed, stating:

> It appears to me that at this point, at this juncture in the proceedings, she is a fact witness. I don't believe that she has been asked to provide expert testimony. In the event that she does move into expert testimony, we will excuse the jurors and let

you voir dire her as to whether she is, in fact, an expert. And we will comply with *Daubert* at that point.

(Id. at 818).

After the district court recessed for the day, Threadgill objected to the admission of Jackson's written summary:

I think we're just reiterating our objection that the Government is presenting, under the guise of a fact witness someone who has essentially written down their theory of the case and her conclusions about how suspicious and inappropriate the Defendant's actions are, and it's just going into an exhibit that the jury will have during deliberations.

We think that's not appropriate for a fact witness, if at all.

(Id. at 843). The district court reiterated its belief that Jackson's testimony and summary were consistent with that of a fact witness, but expressly stated that it would permit Threadgill to challenge Jackson under *Daubert* if she attempted to testify as an expert.

During Bjorkman's testimony regarding her investigation, the Government introduced her summary exhibit. Threadgill objected, stating "We would object. We believe this is purporting to be expert testimony." The district court overruled Threadgill's objection and noted it for the record. Notably, when Threadgill objected to Bjorkman's testimony regarding his renting of the Water Place condo as improper opinion testimony, the district court sustained his objection.

Federal Rule of Evidence 103(a) instructs that a party must "timely object[]" to preserve a claim of error in the admission or exclusion of evidence. Fed. R. Evid. 103(a)(1)(A). However, "[o]nce the court rules definitely on the record—either before or at trial—a party need not renew an objection or offer of proof to preserve a claim of error for appeal." Fed. R. Evid. 103(b). "'If the trial court has made an explicit and definitive ruling on the record of the evidentiary issues to be decided, and has not indicated that the ruling is conditioned upon any other circumstances or

evidence, then counsel need not renew the objection at the time the evidence is offered . . . in order to preserve the error for appeal.'" *United States v. Poulsen,* 655 F.3d 492, 510 (6th Cir. 2011) (quoting *United States v. Brawner,* 173 F.3d 966, 970 (6th Cir. 1999)). "'However, if the court's ruling is in any way qualified or conditional, the burden is on counsel to raise objection to preserve error.'" *Poulsen*, 655 F.3d at 510 (quoting *Brawner,* 173 F.3d at 970).

Here, Threadgill's general objections did not result in a definite ruling on Bjorkman's direct testimony that Threadgill challenges here. The district court did not grant Threadgill a standing objection. At best, the district court issued a conditional ruling on Jackson's testimony, denying Threadgill's general objection, but granting him the right to raise the objection in response to specific testimony by Jackson. *See* (R. 72, Page ID# 818) ("It appears to me that at this point, at this juncture in the proceedings, she is a fact witness. I don't believe that she has been asked to provide expert testimony. In the event that she does move into expert testimony, we will excuse the jurors and let you voir dire her as to whether she is, in fact, an expert. And we will comply with *Daubert* at that point.").

Although Threadgill generally objected to the admission of improper opinion evidence, he failed to object to Bjorkman's two statements challenged here. Threadgill's failure to object to these two statements denied the district court the opportunity to consider their admissibility in their fact-specific context. In our adversarial system, the burden is on the parties, not the court, to identify and raise objections to such testimony. As a result, we conclude that Threadgill failed to preserve his claim of error on appeal. Consequently, we review Threadgill's challenge to Bjorkman's direct testimony for plain error. *See Carney*, 387 F.3d at 453 (if "a defendant neglects to mount an objection to evidence at trial, he is precluded from arguing on appeal that its admission was flawed unless its allowance constituted plain error.").

"[T]he burden of establishing entitlement to relief for plain error is on the defendant claiming it." *United States v. Dominguez Benitez*, 542 U.S. 74, 82 (2004). Threadgill makes no argument that the admission of Bjorkman's two statements challenged here constituted plain error. Therefore, he has not satisfied his burden to establish his entitlement to relief, and his challenge is without merit.

## III. Conclusion

For the reasons set out above, we AFFIRM the judgment of the district court.